**In re NICOLET.**

No. 7427.

District Court, D. Maryland.

April 16, 1935.

Wm. L. Marbury, Jr. (of Marbury, Gosnell & Williams), of Baltimore, Md., and Henry H. Balch, of Easton, Md., for bankrupt.

G. Elbert Marshall, of Easton, Md., for creditors.

CHESNUT, District Judge.

The question in this case is whether the bankrupt, Tell W. Nicolet, should receive his discharge in bankruptcy, in view of objections thereto which have been filed by the Shore Estates, Inc., a creditor, joined in by the trustee duly authorized.

On the request of counsel the issues raised were referred to the referee, Edward T. Miller, of Easton, Maryland, as special master, to ascertain and report the facts with conclusions thereon. On April 1, 1935, the special master filed his report in which he summarizes the facts and states his conclusions but does not expressly recommend either granting or rejection of the application for the discharge; although the conclusions stated from the facts found indicate that the discharge should not be granted. On hearing counsel for the respective parties, it developed that counsel for the bankrupt was in disagreement with the conclusions of the special master (although no exceptions thereto have been filed), and I have, therefore, examined the full record in the case, including the very numerous exhibits, for the purpose of ascertaining if possible whether the findings of fact made by the special master and his conclusions thereon are capable of further definition or require amendment. My own conclusion is that the summary of facts by the special master is substantially accurate and the conclusions are warranted by the record. It is regrettable that his conclusions are not somewhat more definite and specific in certain respects but this is due to the nature of the evidence and particularly to the unfortunate lack of definite and satisfactory accounts of the bankrupt's financial affairs, owing to absence of personal records or bookkeeping.

The objections to the discharge are, of course, necessarily based upon section 14b of the Bankruptcy Act (USCA, tit. 11, § 32 (b), as amended by the Act of May 27, 1926, § 6, which, so far as is here material, reads as follows:

"(b) The judge shall hear the application for a discharge * * *; and investigate the merits of the application and discharge the applicant, unless he has * * *

"(2) destroyed, mutilated, falsified, concealed, or failed to keep books of account, or records, from which his financial condition and business transactions might be ascertained; unless the court deem such failure or acts to have been justified, under all the circumstances of the case; * * * or

"(4) at any time subsequent to the first day of the twelve months immediately preceding the filing of the petition, transferred, removed, destroyed, or concealed or permitted to be removed, destroyed, or concealed any of his property, with intent to hinder, delay, or defraud his creditors; * * * Provided, That if, upon the hearing of an objection to a discharge, the objector shall show to the satisfaction of the court that there are reasonable grounds for believing that the bankrupt has committed any of the acts which, under this paragraph (b), would prevent his discharge in bankruptcy, then the burden of proving that he has not committed any of such acts shall be upon the bankrupt."

The objections to the discharge are based on both of the grounds above quoted from section 14b of the act. It is alleged and undisputed that the bankrupt himself kept no books or written records of his financial transactions for some years prior to his bankruptcy. It is also contended in opposition to the discharge that the bankrupt within 12 months prior to filing his petition, transferred and concealed certain of his property with intent to hinder, delay or defraud his creditors. The particular transfers specified are as follows. On June 25, 1932, the bankrupt transferred a substantial amount of personal property of an estimated value of approximately $3,000 to one Gladys Hilditch, who immediately reconveyed the property to the bankrupt and his wife as tenants by the entireties. The conveyance was made by bill of sale June 25, 1932, and promptly recorded among the Chattel Records of Talbot County, Maryland. This personal property consisted principally of farm equipment and live stock. It is also alleged that on January 13, 1933, the bankrupt assigned his two-thirds interest in a judgment for $17,080 to his wife with similar intent to hinder, delay or defraud creditors. The property represented by the two transfers was not listed in the bankrupt's schedule of assets. The voluntary petition in bankruptcy was filed May 22, 1933. The schedule of assets and liabilities disclosed liabilities in the amount of $13,921.39, and assets of $345.32, all of which excepting less than $100 (claimed as exempt) represented deposits in closed banks.

The special master's conclusions did not expressly state his finding that these transfers were with intent to hinder, delay or defraud creditors although this is the fair inference, I think, from his report; and I have independently reached the conclusion, after examination of the record, that the conveyances were in fact in fraud of creditors.

It is conceded by the bankrupt that the conveyances were intended as preferences to his wife but it is denied that they were in fraud of creditors because there was consideration therefor in an existing indebtedness to the wife. In the law of bankruptcy there is a well settled distinction between transfers that are merely preferences and those which are fraudulent as to creditors. The former do not, while the latter do, constitute sufficient grounds for denying a discharge. Coder v. Arts, 213 U. S. 223, 242, 29 S. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008; Rutter v. General Motors Acceptance Corporation (C. C. A. 10) 70 F.(2d) 479; Collier on Bankruptcy (13th Ed.) vol. I, pp. 562–564, and Supplement 1934, pp. 206–208. But the mere fact that consideration existed in favor of the wife is not conclusive of the question of the bankrupt's good faith in the transaction. In this respect the bankruptcy law was well summarized by Circuit Judge McDermott in Bailey v. Ross (C. C. A. 10) 53 F.(2d) 783, at page 784, as follows: "A fraudulent transfer may be found as a matter of law, as in the case of a transfer by an insolvent without consideration; or, if the transfer be for a consideration, there may be an actual intent to defraud or delay," and, quoting from Coder v. Arts, supra: "and it makes no difference that the conveyance was made upon a valuable consideration, if made for the purpose of hindering, delaying or defrauding creditors. The question of fraud depends upon the motive. Kerr on Fraud & Mistake, 196, 201."

See, also, Dean v. Davis, 242 U. S. 438, 37 S. Ct. 130, 61 L. Ed. 419; Blennerhassett v. Sherman, 105 U. S. 100, 117, 26 L. Ed. 1080; Roberts v. Johnson (C. C. A. 4) 151 F. 567; Humes v. Scruggs, 94 U. S. 22, 28, 24 L. Ed. 51.

Each of these cases must, of course, be decided on its own particular facts, and the facts of this case are perhaps rather unusual. The bankrupt is a man of apparently middle age who, for some years prior to the latter part of 1929, had been actively engaged in Pittsburgh, Pennsylvania, in the

occupation of a landscape architect and had accumulated in Pittsburgh substantial liabilities and had some substantial assets. In 1928 he purchased a waterfront farm with an adjoining island in Talbot County, Maryland, about 143 acres, for a consideration of what I understood counsel to state was approximately $30,000, on account of which he paid apparently $7,000 in cash and the balance was secured by a purchase money mortgage. The conveyance was made to himself and his first wife as tenants by the entireties. It is said by his counsel that in 1929 he lost his first wife and also his business, the latter by reason of general economic conditions; and he thereafter, until he married his present wife on February 3, 1932, was without any substantial income and was engaged in no productive business activity other than the required attention to his farm property in Talbot County where he then lived. When he married his second wife on February 3, 1932, his assets apparently consisted only of his equity in the real estate (the market value of which had materially declined since he purchased it in 1928) and the farm equipment and a claim for services rendered to the Northwestern Cemetery Company of the District of Columbia which subsequently resulted on January 14, 1933, in a judgment for $17,080, one-third of which had been assigned to his attorney as a fee. The present Mrs. Nicolet, however, whose maiden name was Nell V. Berry, had for some years been actively engaged in conducting beauty parlors in the towns of Easton and St. Michaels, Maryland and, according to her testimony, had accumulated several thousand dollars in savings, about $500 of which at the time was represented by bank accounts and, also according to her testimony, the bulk thereof was kept in the form of currency in a safe deposit box. It is the general contention of the bankrupt that between the time of his marriage, on February 3, 1932, and the filing of his petition in bankruptcy on May 22, 1933, he borrowed from his wife practically all of the money that she had accumulated at the time of their marriage and some of her subsequent business profits, which was used by the bankrupt either in partial payments on account of his mortgaged property or for living expenses and in some payments on account of debts; and that the transfers that he made to his wife were preferential payments to her as a creditor and, therefore, did not amount to transfers with intent to hinder, delay or defraud creditors.

Further circumstances relating to the transfer of June 25, 1932 are important.

The bankrupt stated that this transfer was made from himself personally through Gladys Hilditch (an employee in Mrs. Nicolet's business) to himself and his wife as tenants by the entireties pursuant to an original agreement dated March 12, 1932, in which he had agreed to sell her a *one-half interest* in the farm equipment and live stock for approximately $1500. There was produced as the bankrupt's exhibit No. 5, a memorandum of that date to that effect bearing an endorsement "Accepted, Nell V. Nicolet," and reciting an advance of $1477 made by her to one John D. Williams on account of the mortgage. It is importantly to be noted, however, that the transfer actually made was *not* of a one-half interest in this property to the wife leaving a one-half interest in the husband, but a transfer through an intermediary of the *whole* interest in the property to both husband and wife, thus, in legal effect, removing the husband's retained one-half interest from the reach of his creditors. And this is all the more significant in view of the bankrupt's admission that a day or two prior to the conveyance he had been requested by the Shore Estates, his largest creditor, to give it additional security but had declined to do so on the ground that his other creditors would object.

Further light is thrown upon the intention of the bankrupt in this transaction by the series of transfers of other property which he made to his wife after their marriage and prior to his petition in bankruptcy. Thus, on April 9, 1932, he assigned to her a second mortgage on real estate in Pittsburgh in the amount of $4,000. On April 23, 1932, he had transferred to himself and wife as tenants by the entireties through the same Gladys Hilditch as intermediary, his equity in his Talbot County lands. And on January 13, 1933, he transferred to his wife absolutely his two-thirds interest in the judgment for $17,080, and also on the same day assigned to her his interest in certain patents. On May 4, 1933, at a hearing before the United States Commissioner at Salisbury, about two weeks before filing his petition in bankruptcy, the bankrupt stated under oath that he owned property in Talbot County for which he paid $7,000 and that this property was worth $6,000 over and above his just debts and liabilities. Included in the transfer of the farm equipment was an automobile previously registered in his name with the Commissioner of Motor Vehicles and not transferred on the records there.

544

Counsel for the bankrupt in a careful analysis of the record with relation to these several transactions, contends that each one is entirely defensible and an explanation thereof entirely consistent with good faith on the part of the bankrupt can be found. As stated by the special master, it is undoubtedly true that the bankrupt did receive substantial amounts of money from his wife but just how much it is really impossible to find from the record in any satisfactory way. The bankrupt himself kept no books whatever but stated that his wife's records were sufficient and complete. She kept no records whatever of her business transactions with the exception of stubs of certain bank check books and she produced a large number of cancelled checks, from which, however, the referee was not able to construct any definite and certain picture of the financial transactions between the husband and wife. The wife did not produce her income tax returns although she said they had been prepared for her by some one and that she recalled in one year having made a small tax payment of $6.00. The most understandable computation of the financial transactions between husband and wife appear in a paper apparently prepared by counsel for the bankrupt as a summary of the transactions, which reads as follows:

"Paid by Mrs. Nicolet
February 3 to April 9, 1932    $5,353.66
Agreed price of second mortgage   500.00

Bankrupt owed Mrs. Nicolet April 10, 1932   4,853.66
Paid by Mrs. Nicolet
April 10 to June 23, 1932   905.00

Bankrupt owed Mrs. Nicolet June 23, 1932   5,758.66
Agreed price of personal property   1,500.00

Bankrupt owed Mrs. Nicolet June 24, 1932   4,258.55
Refund to Mrs. Nicolet August 1932   500.00

Bankrupt owed Mrs. Nicolet August 1932   3,758.66
Paid by Mrs. Nicolet June 24, 1932 to January 13, 1933   $3,086.27

Bankrupt owed Mrs. Nicolet   $6,844.93
on Jan. 13, 1933"

From this and other data in the record it would appear that Mrs. Nicolet advanced to her husband $500 on account of the Pittsburgh mortgage, there being an absence of any satisfactory testimony as to the value of the mortgage itself. And it is said that the transfer of the equity in the farm property was of no certain and ascertainable value, it being pointed out that within a year thereafter and about the time the bankruptcy petition was filed the property was sold under foreclosure and a deficiency judgment obtained against the bankrupt.

The computation above set out was evidently prepared for the primary purpose of justifying the transfer to the bankrupt's wife of his two-thirds interest in the judgment. According to the computation submitted the bankrupt owed his wife on January 13, 1933, when the judgment was assigned to her, $6,844.93. It will be noted that the next to the last item in this account, $3086.27, said to have been paid by Mrs. Nicolet for the benefit of her husband from June 24, 1932 to January 14, 1933, is probably part of the larger sum of $3,705.77 which the referee was quite unable to satisfactorily determine from the cancelled checks submitted by Mrs. Nicolet. It appears further as affecting the assignment of this judgment that on January 13, 1933, when the amount of the judgment was agreed upon between the parties thereto, $5,000 was paid on account, of which one-third was paid to Mr. Nicolet's attorney on account of his one-third interest, and of the balance received by Mr. Nicolet $1,500 was refunded to Mrs. Nicolet. This credit does not specifically appear in the computation; and there is no certain testimony as to the value of the uncollected balance of the judgment but the inferences seem to be that it is collectible. On the whole the evidence is far from satisfactory that at the time of the assignment of the two-thirds interest in the judgment by the bankrupt, to his wife, the amount of indebtedness then owing to her was so much as $6,844.43 as claimed in the above computation, and the inference is a very reasonable one that the whole of the balance of the judgment, probably worth $8,000 or more net to the bankrupt, was assigned to the wife in order to protect the fund from creditors.

In condensed substance, the case comes to this. A man with substantial debts, absolute and contingent, in the aggregate probably exceeding the value of his capital assets, consisting of land equities and undisputed claims, and with no current income, marries a woman with a few thousand dollar of savings and some small income from a business. In fifteen months practically all her capital has been expended by them in

payment of current living expenses and payment of a small amount of his pressing debts and he has transferred to her absolutely in part and to her and himself as tenants by the entireties, all his property, leaving unpaid practically all his outstanding debts. Shortly more than four months after the last transfer to his wife, he files a voluntary petition in bankruptcy and asks for his discharge. The transfers, under all the circumstances, constitute, in the language of section 14b of the act (11 USCA § 32 (b), "reasonable grounds for believing that the bankrupt has committed" some of the acts which would prevent his discharge; and thus by the act places on him the burden of disproving the inference. In my opinion he has not met this burden of proof. To justify such financial transactions between husband and wife at the expense of creditors, the proof should be much more satisfactory than in this case. In re Graves (D. C.) 189 F. 847; In re Gurney (C. C. A. 2) 71 F.(2d) 144; Karger v. Sandler (C. C. A. 2) 62 F. (2d) 80; Farmers' Savings Bank v. Anton (C. C. A. 8) 1 F.(2d) 103; In re Richter (C. C. A. 2) 57 F.(2d) 159. The bankrupt's contention is that throughout his only intention was to prefer his wife as a creditor. But the evidence is quite unsatisfactory in showing the particular debts or the amounts thereof for which the several transfers were made. There is little contemporaneous evidence that the advances or payments by the wife were definitely treated as debts of the husband when made. Twenty-eight receipts for separate sums dated from February 9, 1932 to June 17, 1932, signed by the husband, aggregating about $7,000 on uniform blanks, were put in evidence. Contemporaneous checks from the wife do not appear. It is said the money was withdrawn in cash from her safe deposit box. With one exception the receipts all bear the notation, "cash" or "cash on account" or "deposited in bank." Notes were not given by the husband and he kept no record or books of the several amounts or their application. The fair inference would seem to be that the money for the most part was used as a common fund for general expenses and that the present effort to treat all the advances as loans is largely retrospective.

I have not overlooked the oral testimony of the bankrupt and his wife, which was to the general effect that the wife had advanced about $11,000 to her husband, and that about $6,000 of this amount was in anticipation of, and on the agreement, that the judgment referred to when obtained should be assigned to her; and she stated also that about the time of her marriage in February, 1932, there was a conference to that effect with the attorney employed to secure the judgment, but the latter apparently did not recall the fact, and the recollection of the wife as to other facts in her testimony, was shown to have been inexact. This testimony of the husband and wife has little bearing on the transfer of the farm stock and equipment, but does tend to support the bona fides of the assignment of the judgment. However, as previously indicated, the amount of the real indebtedness of the husband to the wife is an important issue in the case. The special master evidently concluded the amount claimed in connection with the transfer of the judgment was overstated. After examining the record I cannot say he was not correct in his conclusion. The written record is itself rather unsatisfactory, in form at least, and weight must be given to the consideration that the special master saw and heard the witnesses. It is possible that a more favorable conclusion to the bankrupt would have resulted if he had kept proper financial records.

But even if the record would justify a more favorable view of the bankrupt's intentions there still remains the objection to his discharge on the ground that he kept no books. The effect of the failure to keep books has been recently so comprehensively reviewed by Judge Coleman that it is quite unnecessary to further discuss the law of the subject. In re Miller (D. C. Md.) 5 F. Supp. 913. See, also, Karger v. Sandler (C. C. A. 2) 62 F.(2d) 80; In re Weiner (D. C. Md.) 28 F.(2d) 881; In re Northridge (D. C.) 53 F.(2d) 858. Of course the failure to keep books will not always and under all circumstances deprive the bankrupt of his discharge, and there are considerations in this case which might fairly lead to a determination that the failure would "have been justified under all the circumstances of the case," in view of the bankrupt's lack of general business activity, were it not that he had so extensively transferred property to his wife and now seeks to support the transfers on the basis of numerous financial transactions with her. But in view of the latter consideration and of the critical importance of establishing definite considerations for the respective transfers, the failure of the bankrupt to keep any books from which his true financial condition and his relations with his wife can be satisfactorily found gives added significance to his failure

to keep financial records. Nor, as has been stated, can the wife's bookkeeping be relied upon in the case to demonstrate the status of the accounts with any reasonable certainty. All that can definitely be said is that the wife certainly advanced substantial amounts of money to the husband and, on the other hand, he transferred either to her absolutely or to himself and to her, practically every shred of property that would otherwise have been available to his creditors. The result is that all his property has been put out of reach of his creditors—at least that is the position that he takes because none of it was listed among his assets. Under the circumstances, therefore, I cannot find that his failure to keep a proper financial record is justified under all the circumstances of the case.

 The present policy of the general bankruptcy law is to liberally grant discharges to unfortunate bankrupts who freely surrender their property to their creditors; and otherwise comply with the act. The recent amendment to section 14 somewhat raises the bars to a discharge, although its language is not to be constructively extended. Johnston v. Johnston (C. C. A. 4) 63 F.(2d) 24; Lockhart v. Edel (C. C. A. 4) 23 F.(2d) 912.

Under all the circumstances of this case, I conclude that the application for the discharge must be denied.