**KLAMATH–LAKE PHARMACEUTICAL ASSOCIATION, an Oregon non-profit corporation, on behalf of its assignors, Plaintiff-Appellant,**

v.

**KLAMATH MEDICAL SERVICE BUREAU, an Oregon non-profit corporation, and Klamath Bureau Pharmacy, Inc., a now dissolved Oregon profit corporation, Defendants-Appellees.**

No. 81–3608.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 4, 1982.

Decided March 4, 1983.

As Amended April 1, 1983.

Henry Kane, Beaverton, Or., for plaintiff-appellant.

Thomas M. Triplett, Souther, Spaulding, Kinsey, Williamson & Schwab, Portland, Or., for defendants-appellees.

Before KILKENNY, SNEED, and SKOPIL, Circuit Judges.

SNEED, Circuit Judge:

This appeal was filed by Klamath-Lake Pharmaceutical Association (Association), the assignee of the antitrust claims of a group of pharmacies that service the Klamath Falls, Oregon area. Association's assignors have been losing business to a local nonprofit health care provider, Klamath Medical Service Bureau (Provider), ever since it began to offer prescription drugs in kind under its group health insurance policies. Association in 1978 sued Provider and Klamath Bureau Pharmacy, Inc. (Pharmacy), a local for profit pharmacy Provider once used to distribute prescription drugs under its pharmacy benefit. The district court, after allowing Association to conduct extensive discovery, could not find any wrongdoing and dismissed the lawsuit in a series of partial summary judgments. For the reasons stated below, we affirm.

## I.

### STATEMENT OF FACTS

At the time Association brought this suit, Provider offered two different group policies.[1] Both had major medical coverage and a package of basic benefits, but only one included a pharmacy benefit. This supplemental benefit, available for a higher

---

1. Provider's other two policies, one an individual policy and the other a group Medicare supplement, are not at issue in this lawsuit.

policy premium, entitled insureds to purchase prescription drugs for a small processing fee. The nominal "copay" amount was set at one or two dollars per prescription. Provider's success in marketing its pharmacy benefit led to this lawsuit.

Until July 1, 1976, Provider supplied pharmacy benefits exclusively through Pharmacy. Provider at one point considered expanding its distribution network. Its board of directors voted at their August 1974 meeting to invite local pharmacies to participate if they would accept reimbursement for each prescription at pharmacy cost plus ten percent, minus a copay amount of one dollar. The pharmacies' response, outlined in a letter from pharmacist Robert Gion, was to insist on receiving average wholesale cost plus $2.50 per prescription, minus the copay amount. This rate, which was modeled after Blue Cross' reimbursement policies, would have increased Provider's direct cost for most prescriptions. An expanded program would also have been more expensive to operate. Ted Dicken, Provider's executive director, estimated to the board of directors that increasing the number of participating pharmacies would result in a three-percent increase in administrative costs. The board referred the question to its consumer advisory committee, which recommended that the program not be expanded on these terms. The board agreed, deciding, in Dicken's words, that "at this time it would not be feasible to open the K.M.S.B. Prescriptive drug benefit to other prescription outlets." The increase in premiums and in administrative complexity outweighed the benefit of any added convenience to subscribers.

In 1976 Provider decided to distribute drugs directly. It bought out Pharmacy, dissolved it, and set up a pharmacy on its own premises. Thus, as of July 1, 1976, insureds with few exceptions had to get their prescriptions filled by Provider if they used the pharmacy benefit.

Competing pharmacies were not entirely cut off from business with the insureds of Provider. Groups without the pharmacy benefit had no incentive to shop at Pharmacy while it supplied drugs for Provider because it charged them full market rates. Furthermore, once Provider began to fill prescriptions, it limited sales to insureds using the pharmacy benefit. This restriction forced other policyholders, and all uninsured customers, to use the community pharmacies. The 10,000 policyholders without the pharmacy benefit were still entitled to reimbursement under their major medical provision for 80% of their medical expenses, including prescription drugs, subject to a fifty or hundred dollar deductible. Their purchases constituted a substantial amount of business of the pharmacies. Even policyholders with the pharmacy benefit were free to patronize other pharmacies after hours or during holidays. Although these purchases were made at full cost, reimbursement of 100% of this cost less the copay amount was provided under the terms of the pharmacy benefit. This privilege was important because Provider's pharmacy was only open until 6:00 P.M. on weekdays and 3:00 P.M. on Saturday. Policyholders traveling outside of the Klamath Falls area, and those living in outlying communities, could also use local pharmacies and be repaid under the terms of the pharmacy benefit.

Nonetheless, Provider's prescription drug program cut substantially into the business of local pharmacies. Provider's prescriptions more than doubled between 1974 and 1978, from 33,440 to 77,541; several local pharmacies went out of business and the sales of others dropped rapidly. In response seven pharmacies assigned their antitrust claims to Association, which then brought this lawsuit.

## II.

### THE ISSUES ON APPEAL

Association alleged three causes of action in its complaint. First, it accused Pharmacy and Provider of receiving prescription drugs on terms unavailable to its members, in violation of the Robinson-Patman Act, 15 U.S.C. § 13(f). Second, it claimed that Pharmacy and Provider conspired with af-

filiated physicians, public and private signatories of the group contracts, and labor unions in an attempt to monopolize and restrain trade by compelling insureds to boycott Association's members, in violation of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1–2. Third, it alleged that the insurance contracts tied the health care policy to the prescription drug benefit, in violation of section 3 of the Clayton Act, 15 U.S.C. § 14.

Provider and Pharmacy answered with the affirmative defense of exemption from the antitrust laws under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011–1015. Association sought summary judgment on this issue in March, 1979. The district court agreed to strike the defense as it affected the agreement between Provider and Pharmacy.[2]

In October 1979 Provider filed for partial summary judgment asserting that the McCarran-Ferguson Act shielded it from both the charges of tying and those parts of the boycott claim that rested on the health insurance contract between Provider and its insureds. The court agreed.

This left for resolution only the Robinson-Patman charge and the boycott claim as it applied to Provider's agreement with Pharmacy. Provider and Pharmacy moved for summary judgment on these remaining claims in August 1981. They sought, in the alternative, dismissal of the action under Fed.R.Civ.P. 17(a) because Association was not a real party in interest. They also argued that the assignments did not convey all of the assignors' claims. The district court granted the motion to dismiss. Because of the likelihood of appeal, it went on to reach the merits of the remaining issues. It held for the defendants on these as well. The Robinson-Patman claim fell because Association had turned up only one minor price variation in the thousands of invoices it reviewed during discovery. The court then summarily denied the residual boycott and tying claims.[3] Association appealed.

The issues that must be considered by this court are as follows. First is the validity of the assignments. If Association cannot act as assignee, this appeal must be dismissed. Next are the major substantive problems: the merits of the Robinson-Patman claim, the affirmative defense based on the McCarran-Ferguson Act to the tying and boycott claims, and the merits of these two claims. Last is Association's argument that the district court should have allowed it to amend or supplement its claim. After considering briefly the use of summary judgment in antitrust cases, we will address these issues in order.

### III.

### SUMMARY JUDGMENT AS APPLIED TO ANTITRUST CASES

Summary judgment, dependent as it is on the absence of a "genuine issue as to any material fact," requires an assessment of evidence regarding issues of material fact in the light most favorable to the party opposing the motion to grant such judgment. *ILGW v. Sureck,* 681 F.2d 624, 628–29 (9th Cir.1982); *Heiniger v. City of Phoenix,* 625 F.2d 842, 843 (9th Cir.1980). Summary judgment traditionally has been used sparingly in antitrust litigation because of the factual intricacy of many antitrust issues. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). At the same time, however, antitrust litigation, if made immune from summary judgment, could become an anticompetitive activity itself. For example, a losing competitor could employ an antitrust suit to harass its victorious

---

**2.** This motion was granted on stipulation, with Pharmacy and Provider free to renew the defense for the provider agreement if the Ninth Circuit later found a claim of exemption available in the aftermath of *Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Such a defense has not become available. *See Portland Retail*

*Druggists Ass'n v. Kaiser Found. Health Plan,* 662 F.2d 641, 647 (9th Cir.1981).

**3.** As we read the district court's earlier amended opinion, it had in fact already disposed of the tying claim in full. The meaning of its amended opinion is discussed in notes 13 & 15 *infra.*

opponents. So employed the antitrust laws would impose unwarranted economic costs on the marketplace. Thus, to keep these costs in check we should use summary dispositions to dispose of antitrust complaints that lack any significant supporting evidence. *See, e.g., First National Bank v. Cities Service Co.,* 391 U.S. 253, 289–90, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968); *Betaseed, Inc. v. U & I, Inc.,* 681 F.2d 1203, 1207–08 (9th Cir.1982). Our analysis in this case is guided by these principles.

## IV.

## THE VALIDITY OF THE ASSIGNMENT TO ASSOCIATION

The district court found that Association was not a real party in interest as required by Rule 17(a), but was merely a nominal party which should not have been allowed to prosecute this action. It reached this result because, in its view, the assignors "retained their interest in the outcome of the litigation." Association's request for treble damages for the assignors was taken as an indication that no true transfer of claims had occurred.

■ The district court erred. An assignment of claims does not prevent the assignors from receiving the benefits of the litigation. *Pacific Coast Agricultural Export Association v. Sunkist Growers, Inc.,* 526 F.2d 1196 (9th Cir.1975), *cert. denied,* 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). Thus, in *Sunkist Growers* we upheld an award of damages to fresh fruit growers in litigation brought on assignment by their trade association. *See id.* at 1200. The consideration that moved to Association in this case consists of the transfer to it of authority to bring this suit and to allocate the proceeds. In exchange Association undertook to bring the suit. It is not necessary that the assignors forfeit all interest in possible damages before consolidating their claims in a more efficient class suit.[4] Rule 17(a) is designed to ensure that lawsuits are brought in the name of the party possessing the substantive right at issue. *See* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1541, at 635–36 (1971 & Supp. 1982). It is not to prevent a consolidation of individual claims such as occurred here.

■ The district court also found the transfer of Clayton and Robinson-Patman Act claims ineffective because of a lack of specificity in the assignment. Whether this is correct presents a question of law reviewable de novo by this court. *Maykuth v. Adolph Coors Co.,* 690 F.2d 689, 693 (9th Cir.1982); *Martin v. United States,* 649 F.2d 701, 703 (9th Cir.1981); *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95, 98 (9th Cir.1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981). Because there are no disputed factual circumstances, this issue is also ripe for summary disposition.

---

4. The cases cited by Provider to challenge the assignment involve defects in the party bringing suit that are not present in this case. In *Archie v. Shell Oil Co.,* 110 F.Supp. 542 (E.D. La.1953), *aff'd per curiam,* 210 F.2d 653 (5th Cir.), *cert. denied,* 348 U.S. 843, 75 S.Ct. 64, 99 L.Ed. 665 (1954), the nominal plaintiff was an unpaid yardboy for an attorney who had given him a subsequently invalidated interest in real property via a third party. The district court dismissed the "strange document," which gave the nominal plaintiff the third party's power of attorney over the interest in land and, as consideration, conveyed the interest itself, as void under Louisiana law. *Id.* at 544. *California League of Indep. Ins. Producers v. Aetna Casualty & Sur. Co.,* 175 F.Supp. 857 (N.D.Cal. 1959), did note in dictum that a suit brought by an association of insurance agents would have to be dismissed if the association were a "mere agent for collection," but it added that the association could maintain the suit as an "assignee for collection." *Id.* at 861. *District Distribs., Inc. v. Heublein, Inc.,* 1971 Trade Cases (CCH) ¶ 73,695, at 90,901 (D.D.C.1971), involved an ultra vires assignment that was also void for lack of consideration and champerty. In *Cordova v. Bache & Co.,* 1971 Trade Cases (CCH) ¶ 73,406, at 89,651 (S.D.N.Y.1970), the president of an association of employees in the securities industry was denied standing to maintain an action in his own name without an assignment from the employees. In the absence of similar defects, there is no need to prevent Association from bringing this lawsuit. The rule that an assignor can prosecute its case even if it must later account to the assignees for the proceeds is a seasoned part of Oregon law. *See Hibernia Sec. Co. v. United Mfg. Co.,* 59 P.2d 384, 388, 154 Or. 369, 379 (1936).

We again find that the district court erred. Our task is to enforce the intent of the parties. *Sunkist Growers,* 526 F.2d at 1208. Each assignment contained three descriptions of the claims transferred. An initial paragraph described the transfer as covering all claims arising "by reason of any violation of the Sherman Antitrust Act, as amended, 15 U.S.C. § 1, et seq." Association for its part promised to seek relief "under the federal antitrust laws." The paragraph following this phrase then waived the assignors' rights "under the antitrust laws to proceed as an individual named plaintiff." The district court held that the first description should be given controlling weight and be read to limit the assignment to Sherman Act claims, leaving the pharmacies free to relitigate claims under the Clayton and Robinson-Patman Acts.

We do not find this a plausible interpretation. The contract must be read as a whole. The common-sense meaning of the transfer under the Sherman Act, "as amended," when read in conjunction with Association's broad promise to pursue relief "under the federal antitrust laws" and the assignors' equally broad waiver of their rights to proceed "under the antitrust laws," is that it conveys *all* antitrust claims against Provider and Pharmacy. This is what the parties to the assignment intended. Provider has not suggested any reason for them to have intended otherwise. Association's assignors, whose interests do not diverge, understandably sought to secure more vigorous prosecution of a common opponent, and to increase the likelihood of recovery for related injuries. The added expense of separate actions on non-Sherman Act claims makes Provider's theory of reservation for later prosecution implausible. Furthermore, had the assignors sought to save their claims for later use, they would not have employed the language in question. The assignments are not exemplars suitable to guide future litigants; they are, however, adequate to effectuate a full assignment of all claims. We therefore proceed to Association's substantive claims.

## V.

## PRICE DISCRIMINATION IN PROVIDER'S PURCHASE OF DRUGS FROM LEDERLE

The district court found no merit in Association's complaint of price discrimination. Provider produced over 7,000 documents that covered its purchases from 1974 until mid-1979. Among these Association turned up only one instance of alleged discrimination. Provider purchased drugs from Lederle Laboratories on a ten percent volume discount during 1978 and early 1979. The discount was available to any buyer with purchases over $300. Although its members did not remember having received the offer, Association presented no other evidence of unavailability. This is not enough.

The district court was correct in holding that there was no violation. Any difference in the prices of similar goods is, of course, price discrimination. *FTC v. Anheuser-Busch, Inc.,* 363 U.S. 536, 549–51, 80 S.Ct. 1267, 1274–75, 4 L.Ed.2d 1385 (1960); *William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1040 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). To be forbidden, however, the discrimination must be *illegal.* A buyer who receives a price differential cannot be liable under the Robinson-Patman Act unless the seller is in violation of the Act as well. *Great Atlantic & Pacific Tea Co. v. FTC,* 440 U.S. 69, 75–78, 99 S.Ct. 925, 930–931, 59 L.Ed.2d 153 (1979). Association did not prove any violation by Lederle. It offered no proof that Lederle's discount injured competition substantially. It therefore failed to make the showing required of it. *See Inglis,* 668 F.2d at 1039–40; *Janich Brothers v. American Distilling Co.,* 570 F.2d 848, 854–55 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Texas Gulf Sulphur Co. v. J.R. Simplot Co.,* 418 F.2d 793, 806–07 (9th Cir.1969).

Nor did Association attempt to show that Provider knowingly induced or received Lederle's discriminatory offer. 15 U.S.C. § 13(f); *Automatic Canteen Co. v. FTC,*

346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454 (1953); *J.R. Simplot,* 418 F.2d at 803–06. Construing the evidence in the light most favorable to Association, we hold that there was no Robinson-Patman violation.

■ Association argues that it should have been allowed additional discovery that would enable it to examine Provider's records for recent years. Provider produced documentation for its purchases through mid-1979. Some two years elapsed before the district court issued its final opinion in October 1981. In September 1981 Association filed a request to extend discovery to cover this period, complaining that "since mid-1979 Provider has engaged in a major expansion of its activities, and said expansion is highly relevant to the ... issues raised by the pending summary judgment motion."

The district court denied the request. In doing so it acted well within its discretion. Association does not indicate what it might expect to discover. At some point, the possibility that additional investigation might turn up a real lead becomes less important than the injustice to a defendant against whom no significant evidence has been produced. We have reached that point in this case. The district court did not abuse its discretion. *See Portland Retail Druggists Association (PRDA) v. Kaiser Foundation Health Plan,* 662 F.2d 641, 646 (9th Cir. 1981); *Program Engineering, Inc. v. Triangle Publications, Inc.,* 634 F.2d 1188, 1193 (9th Cir.1980).

## VI.

## THE TYING CLAIM

### A. *As Between The Basic Health Care Contract And The Pharmacy Benefit*

We now turn to Association's allegation of tying. Association alleged a tie between "the basic prepaid health care contract, and

the optional prescription drug benefit that can be obtained only if the subscriber has the basic plan." The district court rejected Association's argument because it found that both the *basic health care contract* and the *optional drug benefit contract* came within the McCarran-Ferguson exemption. We agree.

### 1. *The business of insurance*

The antitrust exemption for the "business of insurance" arose in response to the Supreme Court's decision in *United States v. South-Eastern Underwriters Association,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which overruled prior holdings placing insurance outside the reach of the commerce clause. Congress, wishing to protect the states' traditional role in the regulation of insurance and to avoid endangering the cooperative ratemaking that had played a major role in the industry's development, *see Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 217–24, 99 S.Ct. 1067, 1076–79, 59 L.Ed.2d 261 (1979), quickly passed the McCarran-Ferguson Act. The Act removed the "business of insurance" from antitrust enforcement if (1) it was subject to state regulation and (2) did not amount to a boycott under the Sherman Act.[5]

The Supreme Court in *Royal Drug* excluded health insurers' agreements with third party providers from the business of insurance. Blue Shield, the defendant in *Royal Drug,* invoked the insurance exemption when a group of pharmacists challenged the administration of the pharmacy benefit in Blue Shield's health insurance policy. Blue Shield's benefit, although similar to Provider's in many respects, did not supply drugs directly to its insureds. Independent pharmacies could participate in the plan if they accepted Blue Shield's reimbursement schedule. Most pharmacies

---

**5.** Section 2(b), 15 U.S.C. § 1012(b), provides in part that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." Section 3(b), 15 U.S.C. § 1013(b), adds the qualification that "[n]othing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

chose to participate and signed a provider agreement with Blue Shield.[6]

The question before the Supreme Court was whether the exemption covered the agreements with third party providers. The Court held that it did not; provider agreements between health care insurers and participating pharmacies were not part of the business of insurance. Such agreements were subject to normal antitrust scrutiny.

The "underwriting or spreading of risk" was held to be an "indispensable characteristic of insurance." *Id.* at 212, 99 S.Ct. at 1073. Cost-cutting efforts pursued through such arrangements as provider agreements, however, were no different than the acts of "any enterprise with the responsibility to minimize costs and maximize profits." *Id.* at 217, 99 S.Ct. at 1076. Such business activities affected only the method of payment—not the spreading of risk. The provider agreements were further distinguishable from the business of insurance because they were not part of the contract between the insurer and its insureds and because they involved the insurer's relationship with entities outside of the insurance industry. *Id.* at 215–17, 231–32, 99 S.Ct. at 1075–76, 1083.

The Court applied *Royal Drug* in *Union Labor Life Insurance Co. v. Pireno,* —— U.S. ——, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). Pireno, a New York chiropractor, challenged an insurer's practice of conditioning reimbursement of unusually high chiropractic fees on the decisions of a peer review committee staffed by the New York State Chiropractic Association.[7] The Court tested the referral policy under three requirements drawn from *Royal Drug:* (1) whether the practice transferred or spread a policyholder's risk; (2) whether it lay at the heart of the relationship between insurer and insured; and (3) whether it was limited to entities within the insurance industry. *Id.* at 3009. It held that the referral practice did not transfer risk; it merely reduced costs. The insurance policy transferred risk and was the indispensable component of insurance. Although the policy defined the burden transferred as the cost of "necessary" treatments and "reasonable" charges, standards apparently applied in practice by the chiropractors' committee, this did not make the committee's involvement the business of insurance. This involvement was "logically and temporally unconnected to the transfer of risk accomplished by ULL's insurance policies." *Id.*[8]

**6.** Both nonparticipating and participating pharmacies brought the antitrust suit against Blue Shield. The headnotes to the Supreme Court opinion and that of the Fifth Circuit identify the plaintiffs as nonparticipating pharmacists. 440 U.S. at 205, 99 S.Ct. at 1070; 556 F.2d at 1375. In fact, half of the eighteen plaintiffs participated in Blue Shield's program, *see Royal Drug Co. v. Group Life & Health Ins. Co.,* 415 F.Supp. 343, 347 (W.D.Tex.1976), *rev'd,* 556 F.2d 1375 (5th Cir.1977), *aff'd,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Their role in the case may have resulted more from a desire to hedge their bets than to correct an antitrust violation.

**7.** The insurer, Union Labor Life Insurance Company (ULL), would reimburse only charges it decided were reasonable and necessary, a determination in which it deferred to the committee. Pireno had once sought review of his fees voluntarily, because he believed that going directly to peer review would permit him to avoid a cumbersome substantiation process. *Pireno v. New York State Chiropractic Ass'n,* 650 F.2d 387, 389 n. 2 (2d Cir.1981), *aff'd sub nom. Union Labor Life Ins. Co. v. Pireno,* ——

U.S. ——, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982). His enthusiasm for the process waned when ULL began submitting his claims independently and the committee began rejecting them. *Id.*

**8.** The Court left the contours of its distinction unclear. It explained that the decision to honor a claim rested "entirely" with ULL. *Pireno,* 102 S.Ct. at 3010. Under this analysis, the peer review committee was only an "aid" in making this decision. It did not affect the policyholder directly because his only concern was "*whether* the claim is paid, not *why* it is paid." *Id.* (emphasis in original). But if Pireno was correct that ULL always followed the committee's decisions—an allegation the Court was to weigh most favorably to Pireno when considering ULL's motion for summary judgment— then ULL's decision "whether" to pay chiropractors would turn exclusively on the review board's actions. The questions "whether" and "why" a claim was paid would both rest with the chiropractors' association. *Compare id.* at 3011 n. 8 (peer review merely ancillary to claims adjustment because non-

The Court also held that the insurer's relationship with the peer review committee failed *Royal Drug*'s second and third requirements. The peer review arrangement was beyond the primary relationship between insurer and insured. *Id.* at 3009–10. And the peer review board was not an "entity" in the insurance industry. Its assistance in regulating fees was but cost-cutting activity. *Id.* at 3010–11.

2. *The business of insurance exemption and tying between the basic health care contract and the pharmacy benefit*

 Association's tying claim, as already noted, strikes at the health care contract and the pharmacy benefit appended to it. *Royal Drug* requires that we consider the possibility that the health insurance contract here involved, even when shorn of a pharmacy benefit contract, does not fit the insurance exemption. 440 U.S. at 225–30 & n. 37, 99 S.Ct. at 1080–82 & n. 37. We have thus far skirted the issue in other situations. *See Hahn v. Oregon Physicians Service,* 689 F.2d 840, 843 n. 2 (9th Cir. 1982); *Portland Retail Druggists Association v. Kaiser Foundation Health Plan,* 662 F.2d 641, 647 (9th Cir.1981); *see also St. Bernard Hospital v. Hospital Service Association,* 618 F.2d 1140, 1144–45 & nn. 3–5 (5th Cir.1980). We cannot do this here because Provider argues that the exemption attached to its health insurance policy and also shielded the alleged tying agreement.

We hold that it does. Our decision turns on the Supreme Court's reasoning in *Royal Drug.* The insurer-insured agreement embodied in the basic health care contract and its supplemental pharmacy benefit settles the distribution of the risk that insureds will need medical goods and services, including prescription drugs. It defines the relationship between insurer and insured. And it is limited to these two traditional actors in the insurance industry.

The Court in *Royal Drug* did observe that health insurance was not a common form of insurance in 1945, the year Congress passed the McCarran-Ferguson Act. 440 U.S. at 225–30, 99 S.Ct. at 1080–82.[9] It did not, however, exclude the business of health insurance from the exemption. All it said was, "This is not to say that the contracts offered by Blue Shield to its policyholders, as distinguished from its provider agreements with participating pharmacies, may not be the 'business of insurance' within the meaning of the Act." *Id.* at 230 n. 37, 99 S.Ct. at 1082 n. 37.

We do not believe that the Court intended to remove the business of health insurance from the McCarran-Ferguson exemption. Had it so intended its detailed analysis of the limits of the insurance exemption in *Royal Drug* would have been unnecessary. Nor does *Pireno* suggest otherwise. There both the majority and the dissenters discussed the health care policies without once suggesting that the business of health insurance was not included in the business of insurance. Although the insurer was a traditional insurer, not, as in this case, a health care provider, this should not be determinative. It is the business of insurance, not merely the business of traditional insurers, that activates the exemption. *See id.* at 217, 99 S.Ct. at 1076, *quoted in Pireno,* 102 S.Ct. at 3008, 3010.

Isolation of risk distribution as the primary characteristic of the business of insurance also weighs against limiting that business to risks being shifted by traditional insurers in 1945. It is the actuarial uncertainty inherent in projecting risks and the insurance industry's corresponding need for cooperation that makes its exemption from the antitrust laws appropriate. *See Royal Drug,* 440 U.S. at 221–22, 99 S.Ct. at 1078. Health insurance also has these characteristics. The business of insurance, within the

binding, even when ULL acted on committee's advice).

9. The Court's attempt to demonstrate that the McCarran-Ferguson Congress did not consider health service plans insurance policies drew a

detailed response from the four dissenters. 440 U.S. at 233, 99 S.Ct. at 1084 (Brennan, J., joined by Burger, C.J., and Marshall & Powell, JJ.).

meaning of the McCarran-Ferguson exemption, should not be closed to policies that shift risks not ordinarily so shifted in 1945. Thus, Provider's policies with its insureds, insofar as they shift the risks of medical costs, including pharmacy costs, fully qualify as the business of insurance.

### 3. The state regulation requirement

■ Having settled that Provider's policies, insofar as they shift the risks of medical and pharmacy costs, partake of the business of insurance, we must next determine whether these policies were subject to state regulation. 15 U.S.C. § 1012(b). We hold that they were. Oregon unquestionably regulated health insurance policies. Specific regulations for health care service contractors were included in the Insurance Code, Or.Rev.Stat. §§ 750.005–.340 (1981), as were guidelines for group health insurance, id. §§ 743.522–.558. More generally, the State authorized the Insurance Commissioner to issue regulations banning "any unfair or deceptive act or practice," id. § 746.240, and directed insurers to refrain from "anything which is detrimental to free competition in the business or injurious to the insuring public," id. § 746.160(3). It specifically prohibited abuses like rate control, id. § 746.160(1), and those tying practices that it found undesirable, see id. § 746.130 (prohibiting insurers from tying sale of property or services to insurance without a separate charge); id. § 746.191 (prohibiting tying of insurance to sale of

property or real estate). Furthermore, insurers were subject to state antitrust regulation to the extent free of state insurance regulation. Id. § 646.740(4).

■ This meets the McCarran-Ferguson requirement that the state regulate the challenged activity. See Addrisi v. Equitable Life Assurance Society of the United States, 503 F.2d 725, 727–28 (9th Cir.1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975).[10]

### 4. The boycott exclusion

■ The shelter of the exemption does not extend to practices amounting to a boycott under 15 U.S.C. § 1013(b). This requirement, however, does not stand in the way of an exemption for Provider's policy. The definition of a boycott for purposes of the McCarran-Ferguson exemption is set forth in St. Paul Fire & Marine Insurance Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). St. Paul rejected prior definitions that restricted the scope of the term to boycotts among insurers and agents, see, e.g., Addrisi, 503 F.2d at 728–29. The Court held that the boycott exception should take its broad Sherman Act meaning. Thus, boycotts were not merely limited "to concerted activity against insurance companies or agents or, more generally, against competitors of members of the boycotting group," but extended to refusals to deal with customers of some or all of those engaged in the boycott. 438 U.S. at 552, 98 S.Ct. at 2935.

---

**10.** Unless the practice amounts to a boycott, the states are free to regulate it or choose not to regulate. They do not have to expressly authorize a specific activity, or proscribe it, for the exemption to apply. Addrisi, 503 F.2d at 728. It is enough that a detailed overall scheme of regulation exists. Id.; see, e.g., Freier v. New York Life Ins. Co., 679 F.2d 780, 782 (9th Cir.1982). Our opinion in United States v. Crocker Nat'l Corp., 656 F.2d 428 (9th Cir. 1981), cert. granted sub nom BankAmerica Corp. v. United States, 456 U.S. 1005, 102 S.Ct. 2294, 73 L.Ed.2d 1299 (1982), did not narrow this requirement. Crocker indicated only that regulation of interlocking directorates among insurance companies would not be construed to protect interlocking directorates between insurance companies and banks. We did state that the "most obvious reason for rejecting a claim

of immunity is the absence of any state law regulating the challenged activity." Id. at 452. It is wrong to read this, as did the Court of Appeals for the District of Columbia in Proctor v. State Farm Mut. Auto. Ins. Co., 675 F.2d 308, 317 n. 17 (D.C.Cir.), cert. denied, —— U.S. ——, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982), to require that a regulation specifically affect the challenged practice for it to be exempt. Crocker only applies in the absence of any general scheme of regulation governing insurers' corporate interlocks with banks. We distinguished cases where, as here, a general system of regulation might imply an affirmative decision to allow the behavior not specifically prohibited. 656 F.2d at 453 n. 88. Thus Crocker did not narrow the general language in Addrisi. See id.

To foreclose an exemption for Provider's health insurance policies, however, Association had to prove that the policies constituted an "agreement to boycott, coerce, or intimidate." This it has not done. Association asserts that the conspirators induced policyholders to boycott the local pharmacies by the "effective economic compulsion" derived from its pharmacy benefits. It is true that Provider offered an effective economic inducement for customers to buy drugs from it. And it is undisputed that policyholders who had chosen the pharmacy benefit had to patronize Pharmacy and, later, Provider's on-premises pharmacy to use the benefit.[11] Reimbursement for after-hours and emergency prescriptions purchased elsewhere probably did little to diminish the appeal of Provider's pharmacy benefit. But this does not establish that the health insurance policies implemented a boycott. Insureds remained free to purchase drugs from Association's members if they chose to do so. Provider offered to the public an attractive package which sold well to the detriment of Association's members. The package is part of the many changes affecting the delivery of health care in our time. We are not prepared to hold that the package should be banned from the marketplace by the antitrust laws. Only such a holding would yield the result the plaintiff seeks.

Such a holding would be particularly inappropriate in this case. Provider not only did not exclude Association's members from competing for its policyholders; it also gave them a chance to join the business. Their response was to offer to participate only under terms more favorable to them. When this was rejected they chose to sell less at a higher price rather than more at a lower price. They are entitled to make that choice. They are not entitled to employ the antitrust laws to obtain the market position that will produce both greater sales and higher prices.

Thus, we agree with the district court that the health care policy between Provider and its insureds constituted part of the business of insurance; that Provider was regulated by the State of Oregon; and that its pharmacy benefit did not embody a boycott of Association's members. The tying claim, resting as it does on the agreements in the policy, accordingly must fail.[12]

B. *As Between The Pharmacy Benefit And The Restrictions On The Sources From Which Drugs Can Be Purchased*

Association had two tying theories. The first, as already demonstrated, alleged a tie between Provider's standard health policy and the pharmacy benefit addition. The second is more nebulous. Association's initial complaint read as follows:

A Provider subscriber desiring a prescriptive drug benefit was and is compelled to purchase the benefit as part of a Provider health care policy that "ties" said benefit to purchase of prescription drugs under the policy to a Provider-des-

---

11. Provider claimed that these insureds could also buy prescriptions under their major medical plan. For those making numerous purchases of low-priced drugs, it could be cheaper to pay 20% of drug charges and the deductible, as the major medical required, rather than the copay charge of one or two dollars for every purchase under the pharmacy benefit. Association reads Provider's policy to prohibit those with the pharmacy benefit from getting prescription reimbursement under any other provision. This was a major issue throughout this litigation. Although we find Provider's reading of its contract fully credible, we are unwilling to reject Association's further argument that the deductible amount was a sufficiently effective deterrent to prevent the major medical policy from being fully substitutable for the pharmacy benefit. As we find no merit in Association's claims, our decision does not turn on the question whether the major medical provisions further weakened Association's charges that the pharmacy benefit created an "effective boycott" of its members.

12. Association's argument that Provider's non-exempt involvement with Pharmacy barred it from receiving the protection of the exemption for its other activities is frivolous. Were that the case, every insurer with a provider arrangement (as in *Royal Drug*) or consultative relationship with third parties (as in *Pireno*) would forfeit all of its exemption from the antitrust laws. The business of noninsurance would overwhelm the business of insurance. There is no support for this position in law or logic.

ignated pharmacy and forbids the subscriber, at the risk of losing the benefit, from obtaining prescription drugs under the policy from any competitor of a Provider-designated pharmacy.

The district court took the mention of the designated pharmacy to raise, in addition to the tie in the insurance policy, a tie based on Provider's agreement with Pharmacy. The court summarily rejected the claim.[13] We agree. The provider arrangement did not tie purchase of one product to purchase of another.

■ However, Association may also seek to allege a tie between the pharmacy benefit and its restrictions on the sources from which drugs may be purchased. As Association stated in its Amended Motion for Partial Summary Judgment, "The two products are an insurance benefit covering prescription drugs and the form in which that benefit is to be provided."

Interpreting Association's claim to rest on a tie between the pharmacy benefit and the drug purchase restrictions does not change the outcome. This "tying agreement," linking the pharmacy benefit set forth in the policy and the requirement that drugs be purchased from Provider or Pharmacy, fails for the fundamental reason that it does not implicate two different products.

■ To prevail on a tying claim, whether under section 1 of the Sherman Act, 15 U.S.C. § 1, or section 3 of the Clayton Act, 15 U.S.C. § 14, a plaintiff must first identify a tie between separate products. *Hirsh v. Martindale-Hubell, Inc.,* 674 F.2d 1343, 1346–47 (9th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 305, 74 L.Ed.2d 285 (1982); *Hamro v. Shell Oil Co.,* 674 F.2d 784, 787 (9th Cir.1982); *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1352 (9th Cir.1982). Separateness is determined in part by whether the products are normally sold or used as a unit and whether their joint sale effects savings beyond those of combined marketing. *Siegel v. Chicken Delight, Inc.,* 448 F.2d 43, 48 (9th Cir.1971), *cert. denied,* 405 U.S. 955, 92 S.Ct. 1172, 31 L.Ed.2d 232 (1972) (describing the "function of the aggregate" test). The critical factor is the extent to which a producer's offerings are in response to independently structured consumer demand. Products that function together and are sold in combination may still be "separate" if consumers would prefer to buy them individually at the price necessary to market them separately. Tying denotes illegal coercion: "Rules governing tying arrangements are designed to strike, not at the mere coupling of physically separable objects, but rather at the use of a dominant desired product to compel the purchase of a second, distinct commodity." *Id.* at 47 (*citing Times-Picayune Publishing Co. v. United States,* 345 U.S. 594, 614, 73 S.Ct. 872, 883, 97 L.Ed. 1277 (1953)). Whether a producer's combined products should be considered as separate can be decided only by looking at consumer behavior. It is the relationship of the producer's selling decision to market demand, not the physical characteristics of the products alone, that determines the existence of legally separable products.[14]

---

**13.** The court first granted partial summary judgment under the McCarran-Ferguson Act for Provider on the tying claim only "for those violations which are based on a contract between Provider and its insureds." It left out any claim based on the contract between Provider and Pharmacy. It then amended its opinion, apparently to include the full tying claim in its disposition. *See supra* note 15. Yet in its final opinion the court went to the merits to decide that the provider agreement was not a tying agreement. As we find no support for a tying claim predicated on the provider agreement, we need not decide whether the court intended to dispose of it under the McCarran-Ferguson Act.

**14.** That the product determination hinges on market demand is perhaps clearest in the trademark cases. If consumers seek only the general services of the franchisees, a franchisor cannot tie its trademark to purchase of component goods used in operating franchises. In this "business format" system, consumers "have no reason to associate with the trademark." *Baskin-Robbins,* 664 F.2d at 1353 (discussing *Chicken Delight*). Because franchisees can satisfy consumer demand by using "commonplace" items and applying the franchisor's general methods, coerced purchase of supplies from the franchisor forces consumers to pay for component products they don't really want. The coerced purchase of supplies

There was no separation between the pharmacy benefit and the restrictions on the sources from which drugs can be purchased on these principles. Insureds, the consumers, certainly did not consider these as two separate products. In deciding whether to buy the pharmacy benefit, they made just one decision, comparing the expected cost of the benefit plus copayments for drug purchases against the expected cost of drugs bought at the independent pharmacies. The risk insureds sought to transfer was the risk of high pharmacy bills. The product these consumers sought was a means by which they could satisfy their drug needs on favorable terms. Their purchase of drugs in the required manner was the consummation of the pharmacy benefit, not an unwanted and unnecessary product tied to the desired product.

To treat the pharmacy benefit as separate from the drug purchase provisions makes no more sense than treating a contract granting an option with respect to an item as a product distinct from that consisting of the terms on which the option is to be exercised. The entire option is one product.

This conclusion is not at odds with the Supreme Court's functional division of Provider's role into risk distribution and cost reduction. Provider performed both functions with one product. It differs not from an offer to perform garden maintenance. To maintain a garden requires many tasks of a different nature. The offer, however, is of a single product.

Nor does the split payment for the benefit, requiring an initial premium and then a copayment with each purchase, indicate two products. Copayment's purpose, whatever it might be, does not split the drug purchase terms of the pharmacy benefit from the pharmacy benefit itself. It functions no differently than would a provision in the offer to perform garden maintenance that required the owner of the garden to supply the fertilizer.

No doubt some insureds would have preferred to receive cash from Provider and then to buy their drugs from Association's members had their prices been comparable to those available under the pharmacy benefit. This contingent preference does not demonstrate the existence of two products. It merely shows that Provider's pharmacy benefit product would have been less appealing had Association members' prices been lower.

In conclusion, we find no support for a second tying claim. As we stated in *Hirsh*, "rules governing tying arrangements are designed to strike solely at practices employed to impede competition on the merits." 674 F.2d at 1348. Provider did not impede, but rather stimulated, competition within the pharmaceutical market. We therefore proceed to Association's remaining charge.

## VII.

## THE ALLEGED BOYCOTT TO EXCLUDE ASSOCIATION'S MEMBERS FROM PROVIDER'S BUSINESS

The most favorable interpretation of Association's boycott complaint yields charges of a refusal to deal, an attempt to monopolize, and an exclusive purchasing agreement. The district court, in its amended opinion, dismissed part of this cause of action—the part that rested on Provider's contract with its insureds—under the McCarran-Ferguson Act. We have already affirmed the exemption for Provider's health insurance policies. The court later granted summary judgment against Association on the merits of the residual claims

---

thus can only have an anticompetitive motive. *Id.* In a "distributor" franchise, on the other hand, consumers are drawn to the franchise because its trademark indicates the availability of the franchisor's quality component products. "The franchised outlets serve merely as conduits through which the trademarked goods of the franchisor flow to the ultimate consumer."

*Id.* To prevent the franchisor from forcing franchisees to use only company products would prevent consumers from effecting their market choices. The legality of the franchise arrangement thus turns on the court's perception of its place in consumer demand. *See generally Hamro v. Shell Oil Co.,* 674 F.2d 784, 787–88 (9th Cir.1982).

(based on Provider's contract with Pharmacy).[15] We address these next.

■ We find no evidence, even interpreting the record most favorably toward Association, that requires that we reverse the district court's grant of summary judgment to Provider on the merits of the boycott claim. Association treated the health insurance contract as the end product of a wide group of conspirators that included Provider, Pharmacy, affiliated physicians, public body signatories, employer signatories, and labor unions. It alleged that these conspirators, by establishing the pharmacy benefit while refusing to deal with Association's members, sought to drive independent pharmacies from the market.

Association has done little, however, to support its charges. Some evidence of concerted activity directed at the alleged victims of the boycott must be offered for the case to survive summary judgment. The failure to meet this requirement enables us to dispose of Association's claims of a conspiracy between Provider and Pharmacy, on the one hand, and various physicians, public and private signatories of the health plan, and labor unions, on the other. Association has not pursued its charges against any of the latter group. Although conspiracy sufficient to survive summary judgment may be inferred from circumstantial evidence, the plaintiff must come forward with "significant probative evidence" that supports its conclusion. *Ron Tonkin Gran Turismo, Inc. v. Fiat Distributors, Inc.,* 637 F.2d 1376, 1386 n. 9 (9th Cir.), *cert. denied,* 454 U.S. 831, 102 S.Ct. 128, 70 L.Ed.2d 109 (1981); *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 672 (9th Cir.1980).

■ The possibility of a conspiracy between Provider and Pharmacy is no better supported. Whether Pharmacy be viewed as the sole distributor of Provider's products, administering a package of benefits created by the health care provider, or as a supplier of products under contract to Provider, the arrangement constitutes a lawful scheme of vertical distribution. In the aftermath of *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), we have established narrow grounds for imputing per se illegality to such restrictions: they must "always or almost always tend to restrict competition and decrease output [and not] 'increase economic efficiency and render markets more, rather than less, competitive.'" *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348, 1356 (9th Cir.1982) (*quoting Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1980)); *see, e.g., A.H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1305 & nn. 3 & 5 (9th Cir. 1981); *Ron Tonkin,* 637 F.2d at 1381–82, 1385–88. There is no indication that the arrangement between Provider and Pharmacy would "always" have—or has ever had—the proscribed effect. Therefore, it does not constitute a per se violation of the Sherman Act.

■ Association fares no better under rule of reason analysis. Its burden below was to uncover either anticompetitive intent or specific anticompetitive effects. *A.H. Cox,* 653 F.2d at 1306. It demonstrated neither. Provider's purpose in structuring the provision of drugs for its policyholders was to meet the terms of its policy at the least cost. Association has not shown that Provider or Pharmacy sought to injure competition in the pharmaceutical market. Provider even considered having Association's members join it; but they showed no interest in handling Provider's business at its prices.

---

**15.** The district court first granted partial summary judgment against Association on the second (boycott) cause of action. It also granted summary judgment on the third (tying) cause of action, but only for violations based on the insurance contract, not those resting on the agreement between Provider and Pharmacy. It amended its opinion to issue full judgment on the third cause of action and only partial summary judgment on the second. Nevertheless, in its final opinion the court decided on the merits those portions of both the second and third causes of action that rested on the agreement between Provider and Pharmacy. Our decision here does not turn on the scope of the McCarran-Ferguson exemption actually granted in the district court's earlier opinion.

█ There is also no evidence of injury to competition. Association complains of its members' business losses, but economic injury to competitors is not a per se violation of the antitrust laws. It is injury to the market, not to individual firms, that is significant. *See A.H. Cox,* 653 F.2d at 1307; *Ron Tonkin,* 637 F.2d at 1388; *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). A plaintiff must show that the defendant intended to or did reduce the ability of others to compete before it has shown an actionable restraint of trade. *See Knutson v. Daily Review, Inc.,* 548 F.2d 795, 803 (9th Cir. 1976), *cert. denied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977). In an openly competitive market the inefficient fail; in a non-competitive system the efficient are precluded from competing. We cannot say that Association's members have demonstrated that they are the efficient barred from competing rather than the inefficient who have failed. To hold otherwise would require that the Provider-Pharmacy arrangement be treated as illegal per se. This we cannot do. Provider's arrangement with Pharmacy was simply an exercise of its freedom to contract with whomever it chose in order to sustain itself in the marketplace. The general freedom of a single business to select its partners has been an established part of antitrust law since *United States v. Colgate & Co.,* 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919).[16]

Neither of the other two charges that emerges from a liberal reading of Association's boycott complaint has any validity. There is insufficient evidence of either intent or predatory conduct to support an attempted monopolization claim. *See Moore v. Jas. H. Matthews & Co.,* 550 F.2d 1207, 1219 (9th Cir.1977); *see generally William Inglis & Sons Baking Co. v. ITT Continental Baking Co.,* 668 F.2d 1014, 1027–39 (9th Cir.1981), cert. denied —— U.S. ——, 103 S.Ct. 57, 74 L.Ed.2d 61 (1982). As Association has not proven this charge, we need not decide whether an attempted monopolization claim resting solely on Provider's direct provision of drugs would qualify for McCarran-Ferguson exemption. Finally, as already indicated, we reject Association's argument that Provider's agreement to supply discount drugs to subscribers who would patronize its pharmacy was an illegal purchasing agreement. *See supra* at pp. 1287–1288. There is no merit to any of the boycott claims.

## VIII.

## ASSOCIATION'S PROCEDURAL MOTIONS

Association seeks to sustain the flickering life of this lawsuit by attacking the district court's denial of its motions to amend and to supplement its complaint. The trial court did not abuse its discretion by denying these motions.

█ Motions to amend, we recognize, are commonly granted. Although within the trial court's discretion, leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a); *see Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *McCartin v. Norton,* 674 F.2d 1317, 1320 (9th Cir.1982); *United States v. Webb,* 655 F.2d 977, 979 (9th Cir. 1981); *Howey v. United States,* 481 F.2d 1187, 1190 (9th Cir.1973). We are required to review the exercise of the trial court's discretion to deny a motion to amend strictly. Thus, where the record does not clearly dictate the district court's denial, we have been unwilling to affirm absent written

---

**16.** This freedom extends to the manufacturer who for any lawful reason terminates one distributor or supplier and puts another in its place, even if the terminated businessman is put out of business. *See Chandler Supply Co. v. GAF Corp.,* 650 F.2d 983, 989 (9th Cir.1980); *Las Vegas Sun, Inc. v. Summa Corp.,* 610 F.2d 614, 619–20 (9th Cir.), *cert. denied,* 447 U.S. 906, 100 S.Ct. 2988, 64 L.Ed.2d 855 (1980); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 119 (9th Cir.1972); *Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd.,* 416 F.2d 71, 76 (9th Cir.1969), *cert. denied,* 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970). It easily applies to the case at hand, where Provider did not drop an old associate but merely decided not to initiate contracts with companies that would not deal with it on acceptable terms.

findings, *Webb,* 655 F.2d at 980, and have reversed findings that were merely conclusory, *Howey,* 481 F.2d at 1190–91.

 At the same time, futile amendments should not be permitted. *Foman,* 371 U.S. at 182, 83 S.Ct. at 230; *Smith v. Commanding Officer, Air Force Accounting,* 555 F.2d 234, 235 (9th Cir.1977). In this case, it is clear that Association's motion should be denied for this reason. The district court rejected the motion because it was untimely, and for "other reasons." The most important "other reason" was futility. Asked the purpose of amendment, Association's attorney could only answer vaguely that it would "bring damages up to the current" and "clarify the point" that Pharmacy was a for profit institution. Association has not used Pharmacy's profit status to support any of its claims. And it does not have compensable damages unless it proves its case. It is clear that the district court believed that amendment on these lines could not affect the outcome of this lawsuit. We agree. We find no reason to overturn its decision.

The judgment of the district court is affirmed.

AFFIRMED.