Fred HASS, Plaintiff–Appellant,

v.

**OREGON STATE BAR,**
Defendant–Appellee.

No. 87–3996.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 12, 1988.

Decided Aug. 30, 1989.

---

Michael H. Bloom, Portland, Or., for plaintiff-appellant.

Susan K. Eggum, Portland, Or., for defendant-appellee.

Before GOODWIN, Chief Judge, ALARCON and FERGUSON, Circuit Judges.

ALARCON, Circuit Judge:

## I. INTRODUCTION

Defendant–Appellee Oregon State Bar (Bar) passed a resolution requiring all active Oregon-based attorneys to purchase primary malpractice insurance from the Bar. Plaintiff–Appellant Fred Hass (Hass), a member in good standing of the Bar, contends that the Bar's insurance requirement violates both the Sherman Antitrust Act, 15 U.S.C. §§ 1, 2 (1982) and the commerce clause, U.S. Const. art. I, § 8, cl. 3. The following issues are presented: (1) whether the Bar's insurance requirement is immune from challenge under the Sherman Act by virtue of the state action exemption or by virtue of the exemption for the business of insurance contained in the McCarran–Ferguson Act, 15 U.S.C. §§ 1011–1015 (1982); and (2) whether the Bar's insurance requirement violates the commerce clause.

We find it unnecessary to discuss the McCarran–Ferguson Act because we conclude that the Bar's insurance requirement falls within the state action exemption to the Sherman Act. We also conclude that the requirement does not violate the commerce clause.

## II. PERTINENT FACTS

The Bar is a public corporation and an instrumentality of the judicial department of the government of the State of Oregon. Or.Rev.Stat. § 9.010 (1987). The Bar is governed by a Board of Governors (Board). *Id.* § 9.025. The legislature has expressly granted the Board "authority to require all active members of the state bar engaged in the private practice of law whose principal offices are in Oregon [hereinafter "Oregon-based attorneys"] to carry professional liability insurance...." *Id.* § 9.080(2)(a). The legislature has further empowered the Board, "either by itself or in conjunction with other bar organizations, to do whatever is necessary and convenient to implement" its authority to require Oregon-based attorneys to carry professional liability insurance. *Id.*

The legislature has granted the Board "authority to own, organize and sponsor any insurance organization authorized under the laws of the State of Oregon and to establish a lawyer's professional liability fund." *Id.* The Board is authorized to "assess each [Oregon-based attorney] ... for contributions to such fund...." *Id.* The Board is further authorized "to establish definitions of coverage to be provided by such fund and to retain or employ legal counsel to represent such fund and defend and control the defense against any covered claim made against" an Oregon-based attorney. *Id.* The fund is required to pay, on behalf of such attorneys, "all sums as may be provided under such plan which any such [attorney] shall become legally obligated to pay as money damages because of any claim" of malpractice made against such attorney. *Id.*

In 1977, exercising its delegated authority, the Board passed a resolution, effective July 1, 1978, requiring all Oregon-based attorneys to carry malpractice coverage with aggregate limits of not less than $100,000.[1] The resolution also established

---

1. The Board later raised the required aggregate limits to $300,000. For purposes of the present

the fund contemplated in § 9.080(2)(a), which the Board denominated "the Oregon State Bar Professional Liability Fund" [hereinafter "the Fund"]. The resolution further provided that the required malpractice coverage "for all active members in the private practice of law, with the exception of patent attorneys, *shall* be obtained through" the Fund. (Emphasis added.)

Pursuant to the foregoing resolution, Oregon-based attorneys have been required, since 1978, to participate in the Fund, and the Fund has provided such attorneys with legal malpractice coverage. An Oregon-based attorney's failure to participate in the Fund results in suspension from membership in the Bar.

On February 25, 1987, Hass instituted the present action. Hass' complaint alleged that in mandating attorney participation in the Fund, the Bar unlawfully monopolized the market for primary malpractice insurance, in violation of the Sherman Act, and violated the commerce clause of the U.S. Constitution.

The parties stipulated to the facts recited above and tried the case before the district court. The court did not adjudicate the Bar's liability under the Sherman Act, because the court ruled that the Bar's insurance requirement was immune from challenge under that Act by reason of the state action exemption. The district court also rejected Hass' claim that the Bar's practice violated the commerce clause. Hass now appeals from the final judgment entered in favor of the Bar.

The district court had jurisdiction over the subject matter under 28 U.S.C. § 1331. We have jurisdiction over Hass' timely appeal from the final judgment under 28 U.S.C. § 1291.

## III. DISCUSSION

### A. The State Action Exemption

The question presented is whether the Board's resolution requiring Oregon-based attorneys to purchase primary malpractice insurance [2] from the Bar (hereinafter "the mandatory participation provision") is immune from challenge under the federal antitrust laws by reason of the state action exemption. We review *de novo* the district court's ruling that the Bar is protected by the exemption. *Kern–Tulare Water Dist. v. City of Bakersfield*, 828 F.2d 514, 518 (9th Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988).

■ Recognizing the principle of state sovereignty that underlies our federalist system of government, the Supreme Court has construed the Sherman Act not to apply to anti-competitive acts undertaken by a state in its sovereign capacity. *Parker v. Brown*, 317 U.S. 341, 350–51, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943); *Kern–Tulare*, 828 F.2d at 518. A state is deemed to be acting in its sovereign capacity when it acts through its legislature, *Parker*, 317 U.S. at 350–51, 63 S.Ct. at 313–14, or through its supreme court, acting in a legislative capacity, *Bates v. State Bar*, 433 U.S. 350, 359–60, 97 S.Ct. 2691, 2696–97, 53 L.Ed.2d 810 (1977).

The mandatory participation provision challenged by Hass was not imposed directly by either the Oregon legislature or the Oregon Supreme Court acting in a legislative capacity. The provision was promulgated by the Bar, which is merely an instrumentality of the state judiciary. Thus, promulgation of the mandatory participation provision was not an act of the state in its sovereign capacity. *See Goldfarb v. Virginia State Bar*, 421 U.S. 773, 790–92, 95 S.Ct. 2004, 2014–16, 44 L.Ed.2d 572 (1975) (activity of state bar in approving minimum-fee schedule was not activity of state acting as sovereign); *cf. Hoover v. Ronwin*, 466 U.S. 558, 572–73, 104 S.Ct. 1989, 1997–98, 80 L.Ed.2d 590 (1984) (plurality) (where state supreme court appointed committee to administer bar examination but "retained strict supervisory pow-

---

case, the amount of malpractice coverage mandated by the Board is not significant. Hass does not challenge the Board's requirement that he carry coverage of specified limits; he challenges only the requirement that such coverage be purchased from the Bar.

**2.** The Board's resolution does not prevent an attorney from purchasing *excess* malpractice coverage from the company of his or her choice. Hass challenges the Board's resolution that the primary layer of coverage must be purchased from the Bar.

ers and ultimate full authority" over committee, conduct of committee in grading examination was "in reality" that of state supreme court in its sovereign capacity).

■ Where, as here, the challenged activity "is not directly that of the [state] legislature or supreme court, but is carried out by others pursuant to state authorization," the court must closely analyze the activity to "ensure that the anticompetitive conduct of the State's representative was contemplated by the State." *Hoover*, 466 U.S. at 568, 104 S.Ct. at 1995 (footnote omitted).

■ The Supreme Court has formulated a two-part test to determine whether *Parker* immunity is available to non-sovereign entities engaged in alleged anticompetitive conduct pursuant to state authorization. First, the court must determine whether the challenged conduct has been undertaken "pursuant to a 'clearly articulated and affirmatively expressed state policy' to replace competition with regulation." *Hoover*, 466 U.S. at 569, 104 S.Ct. at 1995; *accord Patrick v. Burget*, 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980) (quoting *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 1135, 55 L.Ed.2d 364 (1978) (plurality)). Second, when the challenged conduct is that of a private party, the court must determine whether the conduct is " 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105, 100 S.Ct. at 943 (quoting *City of Lafayette*, 435 U.S. at 410, 98 S.Ct. at 1135). Whether the conduct of state agencies must also be "actively supervised" by the state is an open question. These requirements are discussed below.

### 1. *The Requirement of a Clearly Articulated and Affirmatively Expressed State Policy*

■ To determine whether the Bar has acted pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation in the field of primary legal malpractice coverage, we must examine the pertinent enabling legislation. If the statutory provisions "plainly show" that the legislature contemplated the sort of activity that is challenged, the "clear articulation" requirement has been satisfied. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 44, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985); *see also Southern Motor Carriers Rate Conf., Inc. v. United States*, 471 U.S. 48, 64, 105 S.Ct. 1721, 1730, 85 L.Ed.2d 36 (1985) ("[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure," the "clear articulation" requirement is satisfied). The legislature will be deemed to have contemplated the challenged activity if the statutes confer "express authority to take action that *foreseeably* will result in anticompetitive effects." *Town of Hallie*, 471 U.S. at 43, 105 S.Ct. at 1718 (emphasis added); *accord Kern–Tulare*, 828 F.2d at 518–19 ("So long as the restraint is a 'foreseeable result' which results logically from a broad grant of regulatory authority ..., the 'clear articulation' requirement is satisfied.").

The legislature need not detail or compel the specific anti-competitive actions at issue, nor need it explicitly state that it expects the regulated party "to engage in conduct that would have anticompetitive effects." *Town of Hallie*, 471 U.S. at 42, 105 S.Ct. at 1718. Likewise, the legislature need not expressly *permit* the challenged conduct. *Southern Motor Carriers*, 471 U.S. at 63–65, 105 S.Ct. at 1730–31.

On the other hand, "the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the ... actions challenged as anticompetitive." *Community Communications Co. v. City of Boulder*, 455 U.S. 40, 55, 102 S.Ct. 835, 842, 70 L.Ed.2d 810 (1982). In *Community Communications*, a state constitutional provision granted cities "the full right of self-government in both local and municipal matters." *Id.* at 43, 102 S.Ct. at 836. The Court held that this provision did not reflect a clearly articulated and affirmatively expressed state policy of replacing competition with regulation in the field of cable television, since the provision did not even address the subject

of cable television. *Id.* at 55, 102 S.Ct. at 842 ("[T]he term, 'granted,' necessarily implies an affirmative addressing of the subject by the State."). The Court explained: "A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought." *Id.*

A state agency is not free to "do as it pleases" simply because the state has left to the agency the task of selecting the course of action best suited to accomplishing the legislative policy. *See Central Iowa Refuse Systems v. Des Moines Metro. Solid Waste Agency,* 715 F.2d 419, 427 (8th Cir.1983) (fact that state left municipality with "a range of options concerning how best to provide for sanitary disposal facilities" did not mean that state's position was one of "mere neutrality" concerning the challenged municipal conduct), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). As the Sixth Circuit has observed:

> An agency vested with broad discretionary powers will rarely find that only one course of action is available to accomplish its mission.... Our task, therefore, is to determine whether the restraints in question are a reasonable and foreseeable exercise of delegated powers within the scope of an agency's authority.

*Hybud Equipment Corp. v. City of Akron,* 742 F.2d 949, 960 (6th Cir.1984), *cert. denied,* 471 U.S. 1004, 105 S.Ct. 1866, 85 L.Ed.2d 160 (1985) (footnote omitted).

Under the foregoing principles, we have found the "clear articulation" requirement satisfied by a variety of legislative schemes comparable to the scheme involved in the present case. *See, e.g., Kern–Tulare,* 828 F.2d at 519–20 (city's refusal to consent to water district's proposed sale of water that district had acquired from city was contemplated by legislature, where statutes empowered municipal corporations to contract for water, to purchase and operate public works to supply water to cities and their inhabitants, and to sell, lease, exchange, or otherwise transfer surplus water); *Grason Elec. Co. v. Sacramento Municipal Util. Dist.,* 770 F.2d 833, 837–38 (9th Cir.1985)

(public utility's alleged monopolization of markets for electrical distribution systems on private property and for street and outdoor lighting systems was pursuant to "clearly articulated" state policy, where statutes authorized utility to acquire, construct, own and operate works for supplying power, to fix its rates below cost, and to "do all things necessary or convenient to the full exercise of the powers" granted by statute), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 886, 88 L.Ed.2d 921 (1986); *Springs Ambulance Serv., Inc. v. City of Rancho Mirage,* 745 F.2d 1270, 1273 (9th Cir.1984) (cities' provision of free municipal ambulance service, which effectively excluded all private ambulance companies from market, was pursuant to "clearly articulated" state policy, where statute provided that "[t]he legislative body of a city may contract for ambulance service to serve the residents of the city as convenience requires") (exclusion of private ambulance companies "was surely within the contemplation of the legislature" when it authorized cities to contract for such services).

Turning to the statutory scheme involved in the present case, the Oregon legislature has authorized the Bar to compel all Oregon-based attorneys to carry malpractice insurance. Or.Rev.Stat. § 9.080(2)(a) (1987). Toward that end, the Bar is authorized "to own, organize and sponsor any insurance organization" and "to establish a lawyer's professional liability fund." *Id.* The legislature has further authorized the Bar to assess each Oregon-based attorney for contributions to the Fund and has stipulated that the Fund "shall pay" all covered sums for which an Oregon-based attorney becomes legally liable as a result of a malpractice claim. *Id.* The legislature provided that the Bar could act *"by itself* or in conjunction with other bar organizations." *Id.* (emphasis added). Moreover, the legislature granted the Bar wide-ranging authority "to do whatever is necessary and convenient to implement this provision [for mandatory malpractice coverage]." *Id.*

This statutory scheme clearly evinces a legislative policy to supplant free market competition with regulation in the field of primary legal malpractice coverage, and to

leave the effectuation of that policy to the Bar. Under these circumstances, the Bar's promulgation of its mandatory participation provision was a foreseeable consequence of the legislative grant of authority. *See Grason,* 770 F.2d at 837–38 (anticompetitive conduct was a foreseeable consequence of legislative grant of authority to own and operate works for supplying power and to "do all things necessary or convenient to the full exercise of the powers" granted by statute).

Hass argues that the statute does not clearly articulate and affirmatively express a state policy because the statute neither "refers to the requirement that attorneys purchase minimum legal malpractice insurance from Defendant" nor does it "direct Defendant to make such a requirement." As stated above, however, a statute need not expressly mention the challenged anticompetitive activity to satisfy the requirement of clear articulation, *Town of Hallie,* 471 U.S. at 42, 105 S.Ct. at 1718, nor must the statute direct or compel the state agency to engage in the challenged activity, *Southern Motor Carriers,* 471 U.S. at 61, 105 S.Ct. at 1729.

For the foregoing reasons, we find that the mandatory participation provision satisfies the first part of the two-part test for protection under the state action exemption. The provision was promulgated pursuant to a clearly articulated and affirmatively expressed state policy to replace competition with regulation in the field of primary legal malpractice insurance.

### 2. *The Requirement of Active State Supervision*

█ The "active supervision" requirement of the state action exemption "stems from the recognition that '[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State.' " *Patrick,* 108 S.Ct. at 1663 (quoting *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720). The requirement ensures "that the state action doctrine will shelter only the particular anticompetitive acts of private parties that, in the judgment of the State, actually further state regulatory policies." *Id.*

█ When there is no danger that the party engaging in alleged anticompetitive activity is pursuing interests other than those of the state, there is no reason to require the party to satisfy the "active supervision" requirement. The state action exemption should be available to such a party whenever the first part of the two-part test is satisfied. Thus, for example, municipalities acting pursuant to clearly articulated and affirmatively expressed state policies are protected by the state action exemption, and no active supervision by the state need be shown. *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720.

Whether a state agency, such as the Bar, must satisfy the "active supervision" requirement is an open question. The Supreme Court has suggested, in dictum, that state agencies need *not* satisfy the requirement to qualify for the state action exemption. *See id.* at 46 n. 10, 105 S.Ct. at 1720 n. 10 ("In cases in which the actor is a state agency, it is likely that active state supervision would ... not be required, although we do not here decide that issue."). We are aware of one circuit court opinion in which the question has been addressed. *See Hancock Industries v. Schaeffer,* 811 F.2d 225, 232 n. 4 (3d Cir.1987). There, the court, albeit without extended discussion, excused both a political subdivision and an agency of the state from having to satisfy the "active supervision" requirement. *Id.* at 232 n. 4, 235–36. Our circuit has not addressed the question whether state agencies should be treated like political subdivisions for purposes of the state action exemption.

In the following passage, the Supreme Court explained why municipalities need not satisfy the "active supervision" requirement:

[T]he requirement of active state supervision serves essentially an evidentiary function: it is one way of ensuring that the actor is engaging in the challenged conduct pursuant to state policy. In *Midcal,* we stated that the active state supervision requirement was necessary

to prevent a State from circumventing the Sherman Act's proscriptions "by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Town of Hallie*, 471 U.S. at 46–47, 105 S.Ct. at 1720–21 (citation omitted).

■ The foregoing rationale applies with equal force to the Bar. The Bar is a public corporation and an instrumentality of the judicial department of the State of Oregon. The Bar "at all times direct[s] its power to the advancement of the science of jurisprudence and the improvement of the administration of justice." Or.Rev.Stat. § 9.080(1) (1987). The Bar is an agency of the state of Oregon organized to regulate the practice of law for the benefit of the public. *See Bates*, 433 U.S. at 361, 97 S.Ct. at 2697 ("[T]he regulation of the activities of the bar is at the core of the State's power to protect the public."). Toward this end, three of the fifteen members of the Board

must be nonlawyer members of the public. Or.Rev.Stat. § 9.025(1) (1987).

The records of the Bar, like those of other state agencies and municipalities, are open for public inspection. *Id.* §§ 9.010(1), 192.410–192.505. The Bar's accounts and financial affairs, like those of all state agencies, are subject to periodic audits by the State Auditor. *Id.* §§ 9.010(1), 297.-210–297.230. The Board, like the governing body of other state agencies and municipalities, is required to give public notice of its meetings, and such meetings are open to the public. *Id.* §§ 9.010(1), 192.610–192.-690. Members of the Board are public officials who must comply with the Code of Ethics enacted by the state legislature to guide the conduct of all public officials. *Id.* §§ 9.010(1), 244.010–244.040. These requirements leave no doubt that the Bar is a public body, akin to a municipality for the purposes of the state action exemption. *See Town of Hallie*, 471 U.S. at 45, 105 S.Ct. at 1719 (a municipality, unlike a private party, "is an arm of the State" and may be presumed to be acting in the public interest absent a contrary showing); *id.* at 45 n. 9, 105 S.Ct. at 1719 n. 9 ("municipal conduct is invariably more likely to be exposed to public scrutiny than is private conduct," in part because of mandatory disclosure regulations.).[3]

When the actor is a state agency subject to requirements such as those set forth above, just as when the actor is a municipality, "there is little or no danger that it is involved in a *private* ... arrangement." *Town of Hallie*, 471 U.S. at 47, 105 S.Ct. at 1720. This is particularly true where, as here, the actions are undertaken pursuant to a clearly articulated and affirmatively expressed state policy. *See* Part III(A)(1)

---

**3.** The dissent states that the Oregon State Bar does not possess the attributes that are characteristic of a municipality because the bar's operation of the fund is not subject to public scrutiny. In particular, the dissent states that, "the actions of the Bar's Board of Governors cannot be checked by the electoral process, as no Board positions are filled by public election." Dissent at 10332. The dissent ignores the fact that only members of the Oregon State Bar are subject to the mandatory malpractice insurance requirement. Members of the Oregon State Bar have

the right and responsibility to elect the members of the Board. ORS § 9.030. Moreover, although members of the bar who are unhappy with the mandatory malpractice insurance assessment do not have the power to "direct, modify or rescind" any assessment, ORS § 9.130(5), such members can petition for a recall of the members of the Board. ORS § 9.050. Thus, those members of the public who are interested parties, the members of the Oregon State Bar, do have the ability to "check" the actions of the Board by the electoral process.

*supra.* "Once it is clear that state authorization exists, there is no need to require the State to supervise actively the ... execution of what is a properly delegated function." *Town of Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720.

Hass emphasizes that the Bar is an instrumentality of the state judiciary, rather than the state legislature. We do not believe this fact is relevant to the question whether the Bar is a state agency. The Bar's status as a state agency depends on whether it is an instrumentality of the government of the state, not on whether it is supervised by one department of government rather than another.

A state bar operating as an instrumentality of the state supreme court is a state agency. *See Goldfarb,* 421 U.S. at 776 n. 2, 790, 95 S.Ct. at 2007 n. 2, 2014. In *Goldfarb,* the Court refused to apply the state action exemption to the Virginia State Bar's enforcement of a minimum-fee schedule published by a county bar association. The Court acknowledged that the state bar was "a state agency by law," *id.* at 789–90, 95 S.Ct. at 2014–15, but held that the bar had not been acting pursuant to any state mandate. In a later discussion of the case, the Supreme Court read *Goldfarb* as establishing that "for purposes of the *Parker* doctrine, not every act of *a state agency* is that of the State as sovereign." *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135 (emphasis added).

In *Bates,* the Court upheld application of the state action exemption to the Arizona State Bar's enforcement of a ban on advertising by attorneys. 433 U.S. at 363, 97 S.Ct. at 2698. The Arizona State Bar, like the Oregon State Bar, was an instrumentality of the state supreme court. *Id.* at 353 n. 3, 361, 97 S.Ct. at 2693 n. 3, 2697. The Court later observed that *Bates,* too, "involved the actions of a state agency." *City of Lafayette,* 435 U.S. at 410, 98 S.Ct. at 1135.

In the present case, the Oregon legislature has expressly designated the Bar as the instrumentality through which the legislature will implement its policies concerning primary legal malpractice insurance. The legislature has authorized the Bar to operate a legal malpractice insurance fund, to assess all Oregon-based attorneys for contributions to that fund, and to do whatever is "necessary and convenient" to ensure that all such attorneys carry the prescribed level of insurance. Under these circumstances, the Bar is clearly an agent of the legislature for the purposes of administering the malpractice insurance program, notwithstanding that it functions as an agent of the state supreme court for other purposes, such as bar admissions. Because we hold that state agencies need not demonstrate that their activities are "actively supervised" by the state, we find it unnecessary to determine whether, or to what extent, the Bar's administration of the insurance program is overseen by either the state legislature or the state supreme court.

■ For the foregoing reasons, we hold that the Bar, as an agency of the State of Oregon, need not satisfy the "active supervision" requirement to qualify for protection under the state action exemption. As long as the Bar acts pursuant to a clearly articulated and affirmatively expressed state policy, it is protected. Because, as discussed above, the Bar has acted pursuant to such a policy in this case, the Bar's conduct is immune from challenge under the federal antitrust laws.[4]

**B. The Commerce Clause**

■ The district court held that the mandatory participation provision of the Bar's resolution did not exceed the scope of permissible state regulation under the commerce clause. The court's ruling was a matter of law, which we review *de novo. United States v. McConney,* 728 F.2d 1195,

---

**4.** Our holding is based on the characteristics of the Oregon State Bar and the particular statutory scheme at issue in the present case. We do not hold that all state bars are protected under the state action exemption to the federal antitrust laws. The dissent's fear that our holding will clothe other state bars in state action immunity is unfounded. *See* Dissent at 1467. Our finding that the Oregon Bar is a state agency does not automatically clothe the bar with state action immunity. As discussed, the clear articulation requirement must be met first.

1201 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

The commerce clause provides: "The Congress shall have Power ... To regulate Commerce ... among the several States." U.S. Const. art. I, § 8, cl. 3. The clause has been interpreted "not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979) (footnote omitted). A state statute triggers scrutiny under the commerce clause in either of two situations: (1) when the statute "affirmatively discriminates," either on its face or in practical effect, against transactions in interstate commerce, or (2) when the statute regulates evenhandedly but incidentally burdens interstate transactions. *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986). Statutes of the first type are subject to demanding scrutiny and will be upheld only if the state demonstrates "both that the statute 'serves a legitimate local purpose,' and that this purpose could not be served as well by available nondiscriminatory means." *Id.* (quoting *Hughes,* 441 U.S. at 336, 99 S.Ct. at 1736). Statutes of the second type, on the other hand, will be upheld unless "the burdens they impose on interstate trade are 'clearly excessive in relation to the putative local benefits,' ...." *Id.* (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970)).

■ The mandatory participation provision of the Bar's resolution clearly falls within the second category described above. The resolution provides "[t]hat such professional liability coverage [as is required by the resolution] for all active members in the private practice of law, ... shall be obtained through the Oregon State Bar Professional Liability Fund." The resolution does not affirmatively discriminate against interstate insurance transactions on its face; nor does it have such an effect. In-state and out-of-state insurance companies are burdened in exactly the same way—all are effectively prevented from competing with the Bar to provide primary malpractice coverage. *See CTS Corp. v. Dynamics Corp. of America,* U.S., 481 U.S. 69, 107 S.Ct. 1637, 1648–49, 95 L.Ed.2d 67 (1987) (state statute regulating takeovers did not discriminate against interstate commerce; it "has the same effects on tender offers whether or not the offeror is a domiciliary or resident" of the state); *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 619, 101 S.Ct. 2946, 2954, 69 L.Ed.2d 884 (1981) (no discrimination where severance tax on mineral production in the state was imposed without "any distinction between in-state and out-of-state consumers"). This is *not* a case in which the challenged regulation operates to place out-of-state providers at a competitive disadvantage. *Cf. Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 350–51, 97 S.Ct. 2434, 2445–46, 53 L.Ed.2d 383 (1977) (statute, although evenhanded on its face, had effect of raising costs of out-of-state sellers while leaving those of local sellers unaffected). Here, all providers—whether local or out-of-state—are equally disadvantaged vis a vis the Bar.

The challenged provision in this case, thus, regulates evenhandedly. If it burdens interstate commerce at all, it does so only incidentally. The provision must be upheld, therefore, unless the burden it imposes on such commerce is "clearly excessive in relation to the putative local benefits." *Pike,* 397 U.S. at 142, 90 S.Ct. at 847. Whether the burden is "clearly excessive" depends on "the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

Assuming *arguendo* that the mandatory participation provision burdens interstate commerce, which Hass has not demonstrated, that burden is not excessive in light of the substantial state interest in ensuring that Oregon-based attorneys are able to satisfy meritorious malpractice claims. Hass concedes, as he must, that "[t]he public should be protected from attorney malpractice." He maintains, however, that the Bar's resolution does not clearly further this important goal.

Oregon's legislative scheme addresses a patent failure in the unregulated market for legal malpractice insurance. The parties have stipulated to the fact that immediately prior to the commencement of the Bar's mandatory malpractice program, approximately 35% of the attorneys in private practice in Oregon were without any legal malpractice insurance coverage. To correct this hazard to the public, the legislature authorized the Bar to do "whatever is necessary or convenient" to ensure that Oregon-based attorneys are covered by malpractice insurance. Included within the legislative grant of authority was the power to own and operate a fund to be used in satisfying the malpractice liability of Oregon-based attorneys.

The mandatory participation provision furthers the state's interest in ensuring universal malpractice coverage in at least two ways. First, it provides a convenient means of monitoring attorney compliance with the requirement that primary malpractice coverage be obtained. Since the Bar itself collects the assessments and provides the coverage, there is little chance that an attorney will be able to evade the requirement.

Second, by maximizing the number of participants in the liability Fund, the Bar is able to provide coverage to attorneys who cannot afford to purchase coverage on the open market, or who are able to obtain coverage only from companies that are financially unstable. *See Feinstein v. Nettleship Co.,* 714 F.2d 928, 932 (9th Cir.1983) (medical association's designation of single insurance broker for all its members "assure[d] coverage for certain high-risk specialties" by "spread[ing] risk across a wide area"), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984). "If competition is permitted in risk selection the socially undesirable consequences may be either that those most at risk cannot obtain insurance at all, or that the solvency of companies which wind up insuring them will be impaired." *Owens v. Aetna Life & Cas. Co.,* 654 F.2d 218, 223 (3d Cir.), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 657, 70 L.Ed.2d 631 (1981). By mandating participation in its Fund, the Bar maximizes the pool of insureds, spreading risk across a wide area. This risk spreading promotes the financial viability of the Fund. Were private carriers permitted to write coverage for selected practitioners, the Fund would be left to insure attorneys who were denied coverage by the private carriers, or who could not afford to buy coverage from such carriers. The Fund would be forced to underwrite an adverse selection of lawyers unacceptable to private carriers. The result would likely be assessments so high that many of these lawyers would not be able to afford the assessments and would be forced to discontinue the practice of law. The Bar is able to offer coverage at affordable rates to all attorneys by mandating that all attorneys participate in the Fund. The mandatory participation provision, therefore, furthers the state's interest in protecting the public from the malpractice of every attorney.

In summary, the Bar's mandatory participation provision does not affirmatively discriminate against interstate commerce, either on its face or in its practical effect. To the extent it incidentally burdens such commerce (and Hass has not demonstrated such a burden), that impact is not excessive, in light of the fact that the provision directly and substantially furthers the state's important interest in ensuring that all Oregon-based attorneys have insurance against liability for malpractice.

## IV. CONCLUSION

We AFFIRM the district court's judgment for the Bar on Hass' antitrust claims. The activity at issue is immune from challenge under the Sherman Act by reason of the state action exemption because the activity was undertaken pursuant to a clearly articulated and affirmatively expressed state policy. We hold that the Bar, like a municipality, need not show that the activity was actively supervised by the state.

We also AFFIRM the district court's judgment for the Bar on Hass' commerce clause claim. The challenged provision regulates a local matter in which the state has a strong interest, and the provision does not impose an excessive burden, if any, on interstate commerce.

FERGUSON, Circuit Judge, dissenting:

I disagree with the majority's conclusion that the Oregon State Bar's insurance-related activities need not satisfy the active supervision requirement for state action antitrust immunity, and respectfully dissent. Furthermore, as there is no active supervision of the Bar's administration of the Professional Liability Fund, and because the Fund is outside the reach of the McCarran–Ferguson exemption to the antitrust laws, I would reverse the district court judgment.

## I.

Grounded in the principles of federalism and state sovereignty, *Parker v. Brown*, 317 U.S. 341, 351, 63 S.Ct. 307, 314, 87 L.Ed. 315 (1943), held that the Sherman Act was not intended "to restrain state action or official action directed by the state." Thus, when a state directly regulates its domestic commerce in a sovereign capacity, any resulting anticompetitive effects receive state action immunity from federal antitrust liability. *See, e.g., Hoover v. Ronwin*, 466 U.S. 558, 572–73, 104 S.Ct. 1989, 1997–98, 80 L.Ed.2d 590 (1984) (state supreme court acting as sovereign when acting in a legislative capacity); *Bates v. State Bar of Arizona*, 433 U.S. 350, 360, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810 (1977) (same); *Parker*, 317 U.S. at 350–52, 63 S.Ct. at 313–15 (state legislature as sovereign). *Parker* also emphasized, however, that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." *Id.* at 351, 63 S.Ct. at 314. While a state remains free to delegate regulatory authority to nonsovereign entities, "closer analysis is required" to ensure that such organizations receive state action immunity only when their anticompetitive actions further a demonstrated state commitment to supplant competition with regulation. *Hoover*, 466 U.S. at 568, 104 S.Ct. at 1995. Toward this end, the Supreme Court established the "clear articulation" and "active supervision" requirements for *Parker* immunity to determine whether the anticompetitive conduct of nonsovereigns should be adjudged state action and thus shielded from federal antitrust liability. *See California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S.Ct. 937, 943, 63 L.Ed.2d 233 (1980).

Since the majority concludes, as they must, that the Oregon State Bar (Bar) does not enjoy sovereign status, whether the Bar's insurance-related activities can be immunized from antitrust liability turns on the extent to which their activities comport with the dual requirements for *Parker* immunity. The Bar's creation and operation of the Professional Liability Fund (Fund) meets the "clear articulation" requirement. Analysis of the legislative history of Or. Rev.Stat. (ORS) § 9.080 shows that the Oregon state legislature clearly sanctioned the creation of a mandatory malpractice liability fund when it delegated rulemaking authority to the Bar. *See Hearings on S. 190 Before the Senate Judiciary Comm.*, April 6, 1977 (statement of Paul J. O'Hollaren, Oregon State Bar) [hereinafter *Senate Hearings*]; *Hearings on S. 190 Before the House Comm. on Business & Consumer Affairs*, May 19, 1977 (statements of Senator Jernstedt and O'Hollaren).

Just as clearly, however, the Bar's operation of the Fund is not actively supervised by state authorities. The majority glosses over this lack of Fund supervision by holding that the Bar, by virtue of its status as a "state agency," need not satisfy this second requirement for *Parker* immunity. Because such a holding not only fails to address the nature of the organized bar, but also undermines the federalism principles embodied in *Parker*, I would hold that the Bar's operation of the Fund must be actively supervised by the state in order to invoke state action immunity from federal antitrust liability.

### A.

At the heart of the active supervision requirement lies a concern for the political sufficiency of state economic regulatory decisions. Based largely on the presumption that governmental bodies such as branches of state government, *see, e.g., Hoover*, 466 U.S. at 573, 104 S.Ct. at 1998

(state supreme court); *Parker,* 317 U.S. at 351, 63 S.Ct. at 314 (state legislature), and political subdivisions, *Hallie v. Eau Claire,* 471 U.S. 34, 46, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985) (municipalities), regulate in the public interest, federalism counsels deference to their anticompetitive decisions. We justify this deference to a state's economic choices, however anticompetitive their effects, with the understanding that they were made by publicly accountable state officials. *See Hallie,* 471 U.S. at 45 & n. 9, 105 S.Ct. at 1721 n. 9 (municipal sewage regulations not required to meet active supervision requirement because actions of municipal officers checked by mandatory disclosure regulations and electoral process); *Hoover,* 466 U.S. at 599, 104 S.Ct. at 2011 (Stevens, J., dissenting) (antitrust laws "simply require that decisions to displace the free market be made overtly by public officials subject to public accountability"); *see also New Motor Vehicle Bd. v. Orrin W. Fox Co.,* 439 U.S. 96, 109, 99 S.Ct. 403, 411, 58 L.Ed.2d 361 (1978) (state restrictions on location of automobile dealerships accorded state action immunity since program included public hearings when automobile franchisees protested placement of competing dealerships); *Parker,* 317 U.S. at 352, 63 S.Ct. at 315 (state agricultural commission approval of collective pricing by raisin cartels preceded by public hearings); Jorde, *Antitrust and the New State Action Doctrine: A Return to Deferential Economic Federalism,* 75 Cal. L.Rev. 227, 249–250 (1987) (active state supervision requirement promotes citizen participation value of federalism).

The same aura of public accountability does not accompany the regulatory decisions of private parties. Unlike a public actor, "there is a real danger that ... [a private party] is acting to further his own interests, rather than the governmental interests of the State." *Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720; *accord Patrick v. Burget,* 486 U.S. 94, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988). Thus, the active supervision requirement ensures that those exercising private delegations of regulatory authority do not forsake the public goals of a state's economic policy in favor of their own private regulatory agendas. *See Patrick,* 108 S.Ct. at 1663 (absent supervision "there is no realistic assurance that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests"). State supervision of delegated authority prevents states from frustrating the national policy of marketplace competition by casting a "gauzy cloak of state involvement" over what are essentially private restraints on competition. *Midcal,* 445 U.S. at 106, 100 S.Ct. at 944; *see also 324 Liquor Corp. v. Duffy,* 479 U.S. 335, 107 S.Ct. 720, 726, 93 L.Ed.2d 667 (1987); *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 57, 105 S.Ct. 1721, 1726, 85 L.Ed.2d 36 (1985).

The majority's conclusion that the Bar need not satisfy the active supervision requirements blurs, if not eliminates, this logical distinction between public and private economic regulation. While the majority appears content to paint the Bar as a state agency or other form of public body "akin to a municipality for purposes of the state action exemption," [1] it offers only a partially completed portrait. The Bar's private interests in the very field in which it regulates—professional malpractice insurance—coupled with the lack of public accountability for its Fund-related activities, reveals that the Bar presents a poor candidate for exemption from the active supervision requirement.

Conspicuously absent from the majority's discussion is any acknowledgment of the potential for abuse when a state delegates regulatory authority to an organization, such as the Bar, which brings its own set of economic interests to bear on the

---

**1.** Apparently the majority cannot decide on the institutional pedigree of the Bar under Oregon law as it alternatively characterizes the Bar as "an instrumentality of the judicial department of the State of Oregon," "a public body[ ] akin to a municipality," "a state agency," and "an agent of the legislature for the purposes of administer-

ing [the Fund]." The majority's inability to concretely define the organizational nature of the Bar highlights its hybrid nature, and, thus, serves to underscore the need for closer review of the majority's portrayal of the character of the Bar.

regulated field. Experience has shown that, best intentions aside, the organized bar may seek to protect the interests of its members despite arguably conflicting public interests. Dissenting in *Hoover*, 466 U.S. at 585, 104 S.Ct. at 2004, Justice Stevens voiced this concern: "When [state] ... authority is delegated to those with a stake in the competitive conditions within the market, there is a real risk that public power will be exercised for private benefit."

Perhaps in recognition of this economic reality, the Supreme Court has never authorized a state bar to exercise independent authority over regulation of the legal profession. In *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), the Court refused to extend *Parker* state action immunity to fee schedules enforced by the Virginia State Bar, an administrative agency by state law, when the state's Supreme Court Rules did not require such anticompetitive fee restraints. "The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." *Id.* at 791, 95 S.Ct. at 2015 (citation and footnote omitted).

While the two remaining Supreme Court decisions addressing the authority of state bar organizations to regulate the legal profession ultimately held that the challenged conduct was immune from antitrust attack, each based this holding on the state bar's *lack* of independent regulatory authority. In affirming the disputed disciplinary rules restricting legal advertising in *Bates v. State Bar of Arizona*, 433 U.S. 350, 361, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977), the Court noted that the state bar's role in disciplinary enforcement consisted solely of acting "as the agent of the [state supreme] court under its continuous supervision." Given the extensive official oversight over the state bar's enforcement responsibilities, the *Bates* Court had no reason to fear aggrandizement of private economic interests: Moreover ... the [disciplinary] rules are subject to pointed re-examination by the policymaker—the Arizona Supreme Court—in enforcement proceedings. Our concern that federal policy is being unnec-

essarily and inappropriately subordinated to state policy is reduced in such a situation; we deem it significant that the state policy is so clearly and affirmatively expressed and that the State's supervision is so active. *Id.* at 362, 97 S.Ct. at 2698.

Finally, in *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), the Supreme Court upheld Arizona's bar admission procedures which permitted a state bar committee to compile and grade bar examinations, but reserved the final admission decision for the Arizona Supreme Court. Applying *Bates*, the *Hoover* Court found it persuasive that while the Arizona Supreme Court delegated some discretionary authority to the committee, it nevertheless "retained strict supervisory powers and ultimate full authority over [the committee's] ... actions." *Id.* at 572, 104 S.Ct. at 1997. Taken together, *Goldfarb*, *Bates*, and *Hoover* thus reinforce the proposition that when independent regulatory authority is delegated to a state bar, particular care must be taken to ensure that public authority is not being used to further private economic agendas.

While the potential for self-interested economic behavior may not be sufficient in and of itself to trigger the active supervision requirement, when viewed in light of the Bar's lack of publicly accountable decisionmaking, there is a need for state oversight. The majority likens the Bar to a municipality or state agency in terms of providing opportunities for public participation in regulatory decisions, but closer analysis reveals the flaws in both of these analogies.

Acknowledging the public nature of municipalities, *Hallie v. Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), concluded that the active supervision requirement should not be imposed when the regulatory actor was a municipality. *Hallie* premised this conclusion on the common sense view that a municipality's position in the public eye provides some protection against antitrust abuses. *Id.* at 45 & n. 9, 105 S.Ct. at 1719 & n. 9. Yet few of the "public" features the Court found persuasive in *Hallie* are present in this case.

While municipal regulatory decisionmaking is usually preceded by public hearings or other mechanisms for airing opinions or concerns, *see* ORS § 221.420 (contested rate filings by municipally regulated public utilities subject to voter ratification), the Bar's operation of the Fund is subject to neither mandatory disclosure regulations, ORS § 9.010(1); ORS §§ 244.050–244.201, nor rate hearings for aggrieved parties, ORS § 9.080(2)(a); ORS § 737.340. Moreover, the actions of the Bar's Board of Governors cannot be checked by the electoral process, as no Board positions are filled by public election. *See* ORS § 9.025(1). In short, rather than being characterized by accessibility and openness, the Bar's operation of the Fund suggests insularity. Under such circumstances, *Hallie's* presumption of conduct in the public interest does not apply to the Bar.

The majority's attempt to characterize the Bar as a "state agency" proves no more persuasive in furthering its position that the public aspects of the Bar's activities make the active supervision requirement inapplicable.[2] The Bar's regulatory authority is simply not constrained by the same degree of public scrutiny typically governing other state agencies. While state agencies may not operate as democratically as municipal governments, they usually provide some opportunity for public participation in regulatory decisions. *See, e.g., Southern Motor Carriers*, 471 U.S. at 50–51, 105 S.Ct. at 1723–24; *New Motor Vehicle Bd.*, 439 U.S. at 103, 99 S.Ct. at 408; *Parker*, 317 U.S. at 346–47, 63 S.Ct. at 311–12. To ensure public accountability for regulatory decisions, many state administrative agencies, including those in Oregon, allow for public input on proposed rules, provide hearings for interested parties, and undergo regular budgetary review. *See, e.g.*, ORS §§ 182.010–182.105 (general rules governing state agencies), 183.310–183.550 (administrative procedure of state agencies), 291.015–291.028 (budgetary review of state agencies). The Bar, however, is not required to submit *any* of its Fund decisions for public scrutiny. Requiring active supervision of the Bar would serve the salutary purpose of ensuring that the public, either directly or through publicly accountable state officials, would have an opportunity to participate in a delegated regulatory decisionmaking process of significant public importance.

While the majority purports to narrow its holding by basing it on the "characteristics of the Oregon State Bar and the particular statutory scheme at issue in the present case," the majority alludes to no particular organizational aspects of the Bar that are not shared by other integrated state bars. In fact, the scope of authority enjoyed by many state bars bears a striking resemblance to that found in the Oregon bar scheme prior to the creation of the Fund. *See, e.g.*, Ala.Code § 34–3–40 to 34–3–43 (1988); Alaska Stat. § 08.08.010–.100 (1987); Cal.Bus. & Prof.Code §§ 6000–6076 (1974 & Supp.1989); Idaho Code § 3–401 to 3–420 (1979 & Supp.1988); Mich.Stat.Ann. § 27A.901–27A.910, M.C.L.A. §§ 600.901–600.910 (1986); Nev.Sup.Ct.R. 49–75 (1988); Tex.Gov't Code Ann., title 2, subtitle G, app. arts. I–XIII (1988). Accordingly, notwithstanding the majority's best efforts to limit the scope of its holding, there is little doubt that, under its approach, more state bars than simply Oregon's will be clothed in state action immunity.

### B.

Having concluded that the Bar need not satisfy the active supervision requirement to qualify for state action immunity from federal antitrust liability, the majority specifically declined to reach the issue of "whether, or to what extent, the Bar's administration of the [Fund] ... is overseen by either the state legislature or the state supreme court." Only a brief review of the statutory scheme at issue is necessary, however, to conclude that no state actor supervises the Bar's operation of the Fund. ORS § 9.080 provides no avenues for the Oregon state legislature or supreme court,

---

**2.** At no point does the Oregon statutory scheme identify the Bar as a state agency. However, for the purposes of argument, I accept the majority's characterization of the Bar as a state agen-cy. In the final analysis, however, I do not believe that this or any other organizational label proves dispositive on the issue of the Bar's antitrust liability.

acting in their sovereign capacities, to "have and exercise power to review [the Bar's] particular anticompetitive acts ... and disapprove those that fail to accord with state policy." *Patrick*, 108 S.Ct. at 1663; *see also 324 Liquor Corp.*, 107 S.Ct. at 725–26. Nor does the Director of the Oregon Department of Insurance possess any regulatory authority over the Fund. *See* ORS § 9.080(2)(a). While active members of the Bar may generally modify or rescind Bar decisions, they carry no such authority with respect to Fund assessments. *Compare* ORS § 9.130(1) *with* ORS § 9.130(5). Rather, like the state wine pricing system denounced in *Midcal*, "the State simply authorizes price setting and enforces the [established] prices ... it does not monitor market conditions or engage in any 'pointed reexamination' of the program." *Id.* 445 U.S. at 105–06, 100 S.Ct. at 943–44 (footnote omitted).

Indeed, the only two entities with direct authority over Fund operations are the Bar's Board of Governors and the Board of Directors of the Fund, *see* ORS § 9.080(1); Resolution of the Oregon State Bar Board of Governors (effective July 1, 1978), ¶¶ 4–6 [hereinafter Board of Governors' Resolution], each of whose individual board members consist largely, if not entirely, of attorneys.[3] While active state supervision may include oversight by a regulatory authority such as a state administrative agency, *see, e.g., Southern Motor Carriers*, 471 U.S. at 66, 105 S.Ct. at 1731 (1985), it would be a case of fox-watching-the-henhouse to conclude that these two Boards could provide meaningful supervision over the Fund. Thus, because no state actor in Oregon actively supervises the Bar's operation of the Fund, I would hold that *Parker's* state action doctrine does not protect the insur-

ance-related activities challenged in this case from the federal antitrust laws.

## II.

The Bar claims that even if it does not qualify for state action immunity from the antitrust laws, Hass' suit still must be dismissed as the Fund falls within the McCarran–Ferguson Act's exemption to the Sherman and Clayton Acts. This contention also lacks merit.

The McCarran–Ferguson Act (the Act) was enacted in 1945 in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that insurance transactions were subject to congressional regulation in general, and the strictures of the anti-trust laws in particular. The Act was designed to turn the clock back to the state of insurance regulation before *South–Eastern Underwriters*, to assure that to activities of insurance companies in dealing with their policyholders would remain subject to state regulation. *See S.E.C. v. National Securities, Inc.*, 393 U.S. 453, 458–59, 89 S.Ct. 564, 567–68, 21 L.Ed.2d 668 (1969). Congress, convinced that intra-industry cooperation was essential to maintain the financial stability of the insurance industry, was particularly concerned with protecting the rate-making regulatory schemes of the individual states from the federal antitrust laws' prohibitions. *See Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 221, 99 S.Ct. 1067, 1078, 59 L.Ed.2d 261 (1979).

Under the Act a practice is exempt from the federal anti-trust laws if it is (1) the "business of insurance," (2) regulated by state law, and (3) does not involve coercion, intimidation, or boycott.[4] *Feinstein v. Net-*

---

**3.** Twelve of the fifteen members of the Board of Governors must be active members of the Oregon State Bar, ORS § 9.025(1), while all seven of the Fund's Board of Director positions are restricted to active members of the Bar. Board of Governors' Resolution, ¶ 4.

**4.** Section 2 of the McCarran–Ferguson Act provides that:
  (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

  (b) No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulation the business of insurance.... *Provided,* that ... the Sherman Act, and ... the Clayton Act, and ... the Federal Trade Commission Act ... shall be applicable to the business of insurance to the extent that such business is not regulated by state law.
15 U.S.C. § 1012.
  Section 3 of the Act provides, in pertinent part, that:

*tleship Co. of Los Angeles,* 714 F.2d 928, 931 (9th Cir.1983), *cert. denied,* 466 U.S. 972, 104 S.Ct. 2346, 80 L.Ed.2d 820 (1984). *Klamath Lake Pharmaceutical Ass'n v. Klamath Medical Service Bureau,* 701 F.2d 1276, 1284 (9th Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 88, 78 L.Ed.2d 96 (1983).

While a persuasive argument exists that the operation of the Fund qualifies as the business of insurance under the Act, we need not reach a conclusion on the issue.[5] Even assuming the administration of the Fund does constitute the business of insurance, the Bar cannot invoke the McCarran–Ferguson exemption as the Bar's insurance-related activities are not "regulated" by state law under § 2(b) of the Act and the Bar's rules concerning the operation of the Fund involve "coercion" within the meaning of § 3(b) of the Act.

### A.

The regulation requirement of the Act is contained in § 2(b); this section, in relevant part, provides that the Sherman Act "shall be applicable to the business of insurance to the extent that such business is not regulated by state law." 15 U.S.C. § 1012(b).

This circuit, along with a majority of other circuits, has held that as long as a general state regulatory scheme exists

which possesses jurisdiction over the challenged practice, then the practice is regulated by state law within the meaning of the Act. *See Feinstein,* 714 F.2d at 933; *Addrisi v. Equitable Life Assurance Society of the United States,* 503 F.2d 725, 728 (9th Cir.), *cert. denied,* 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400, *reh'g denied,* 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790 (1975). While the Oregon Insurance Code is precisely the type of state regulatory scheme that would satisfy the Act's regulation requirement, the Fund, as noted above, is expressly exempt from all requirements of the Insurance Code. *See* ORS § 9.080(2)(a) ("any fund so established shall not be subject to the Insurance Code of the State of Oregon"). Since the Insurance Code does not possess jurisdiction over the Bar's challenged practice, it cannot satisfy the regulation requirement under the Act.

The Bar attempts to bring the Fund within the state regulation requirement by arguing that ORS § 9.080, the statute which authorizes the creation of the Fund, constitutes state regulation within the meaning of the Act. To support its proposition, the Bar cites *California League of Independent Insurance Producers v. Aetna Casualty & Surety Co.,* 175 F.Supp. 857 (N.D. Cal.1959), which held that when a state statute "generally permits or authorizes

---

Nothing contained in this act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation. 15 U.S.C. § 1013.

**5.** The Supreme Court has set forth three factors to consider in determining whether a challenged practice constitutes the business of insurance: (1) whether the practice has the effect of transferring or spreading a policyholder's risk; (2) whether the practice is an integral part of the policy relationship between the insurer and insured; and (3) whether the practice is limited to entities within the insurance industry. *United States Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008, 73 L.Ed.2d 647 (1982). While the Supreme Court stated that "none of the criteria is determinative in itself," the Ninth Circuit's discussion of the factors has emphasized that the primary characteristic of the business of insurance is the transferring or spreading of risk. *See Feinstein,* 714 F.2d at 931; *Klamath–Lake,* 701 F.2d at 1285.

Applying these criteria to this case, it seems fairly clear that the Fund satisfies the first two factors. The legislative history of ORS § 9.080

strongly suggests that one of the primary objectives in authorizing the Bar to require participation in the Fund was the minimization and spreading of risk. *See Senate Hearings* (testimony of Paul J. O'Hallaren). Additionally, the focus of Hass' challenge is the nature of the relationship between the insurer, the Bar, and the insured, Oregon attorneys. As for the third criterion, it is somewhat difficult to apply to this case since we are not faced with the insurer-third-party arrangements that the court was contemplating when it articulated this factor. *See Royal Drug,* 440 U.S. at 224, 99 S.Ct. at 1080; *Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009. While one could argue that this factor should be interpreted as limiting the McCarran Act exemption to traditional entities in the insurance industry, such a proposition finds no support in the case law. As this court stated in *Klamath–Lake,* "[i]t is the business of insurance, not merely the business of traditional insurers, that activates the exemption." *Klamath–Lake,* 701 F.2d at 1286.

certain conduct on the part of the insurance companies," it regulates the business of insurance within the meaning of § 2(b). *Id.* at 860. The district court reasoned that this interpretation of § 2(b) followed naturally from the Supreme Court's holding in *F.T.C. v. National Casualty Co.*, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). In *National Casualty*, the Court determined that a state statute which generally prohibited unfair advertising within the insurance industry and authorized enforcement through a scheme of administrative supervision satisfied the proviso in § 2(b). *Id.* In so holding, the Court rejected the F.T.C.'s contention that because the general prohibitory legislation at issue had not "crystallized into administrative elaboration of [the] standards and applications in individual cases" it was too inchoate to constitute "regulation" within the meaning of the Act. *Id.* at 564–65, 78 S.Ct. at 1262.

While the Court's narrow holding in *National Casualty* is somewhat ambiguous, the district court in *California League* clearly erred in holding that general statutory authorization or permission constitutes state regulation under the Act. First, contrary to *California League's* logic, the fact that a general *prohibitory* statute like the legislation at issue in *National Casualty* satisfies the regulation requirement in no way suggests that mere statu-

tory *authorization* of a particular anticompetitive practice also constitutes "regulation." Second, and more importantly, *California League's* pronouncement is contrary to the legislative history of § 2(b). Senate debate on § 2(b)'s regulation requirement is replete with commentary suggesting that the states could not, by enacting statutes authorizing or permitting certain practices, render such activity immune to the federal antitrust laws.[6] *See Crawford v. American Title Insurance Co.*, 518 F.2d 217, 224 (5th Cir.), *reh'g denied*, 521 F.2d 814 (5th Cir.1975) (Godbold, J., dissenting); *see also* Carlson, *Insurance Exemption* at 1156.

Finally, it is worth noting that while other courts have cited the *California League* language at issue to support a finding that § 2(b)'s regulation requirement had been met, all such cases have in fact involved either some general regulatory insurance scheme or prohibitory legislation. *See e.g., Commander Leasing Co. v. Transamerica Title Insurance Co.*, 477 F.2d 77, 83 (10th Cir.1973); *Ohio v. AFL–CIO v. The Insurance Rating Board*, 451 F.2d 1178, 1182–83 (6th Cir.1971), *cert. denied*, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972); *Crawford v. American Title Insurance Co.*, 518 F.2d at 219. Thus, there is no case authority to support the Bar's contention that ORS § 9.080 satisfies the Act's

---

**6.** Since the regulation proviso in § 2(b) originated in conference, the Conference Committee Report on the McCarran–Ferguson Act did not address the issue, and the House of Representatives approved the bill without debate; the Senate debate is the only source of congressional intent concerning the term "regulated". *See* Carlson, *The Insurance Exemption from the Antitrust Laws*, 57 Tex.L.Rev. 1127, 1156 (1979) [hereinafter Carlson, *Insurance Exemption* ].

On the first day of the debate, Senators McCarran and O'Mahoney repeatedly emphasized that only state legislation *regulating* insurance, not simply permissive state legislation, would satisfy § 2(b). *See* 91 Cong.Rec. 1443–1444 (1945). At one point, Senator McCarran stated:

During the 3–year moratorium, the States may, if they see fit to do so, *enact legislation for the purpose of regulation.* If they do enact such legislation, to the extent that they regulate they will have taken the business of insurance ... out from under the Sherman ..., the Clayton ..., and the other acts.

*Id.* at 1443 (emphasis added).

Later in the debate, Senator O'Mahoney, in response to Senator Pepper's concerns that § 2(b)'s language was too generous to the states in that it provided an easy means to evade federal power over the insurance industry, asserted:

I interpret ... ["to the extent not regulated by state law"] to be a clear statement that if the States do not regulate, the power of Congress to regulate is clearly enunciated. *I do not conceive this to be a grant of power to the States to authorize by permissive legislation obviously adverse combinations which would be against the public interest.*

*Id.* at 1444 (emphasis added).

Senator O'Mahoney's comments on the second day of the Senate debate that the bill only authorized the states to permit what would otherwise be Sherman Act violations if they created regulatory schemes akin to public-utility rate-setting mechanisms is yet another piece of evidence that Congress had more in mind than simply permissive legislation when it enacted § 2(b). *See id.* at 1483.

regulation requirement. Given that the Bar has not drawn our attention to any other statute or regulatory scheme which could satisfy the state regulation requirement, the Bar has failed to show that the Fund is regulated by state law as required by § 2(b) of the Act.

### B.

The Bar is also precluded from invoking the McCarran–Ferguson exemption on the grounds that the operation of the Fund amounts to coercion, and is thus outside the scope of this limited immunity to the antitrust laws.

Section 3(b) of the Act specifies that the antitrust exemption will not extend to "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion or intimidation." 15 U.S.C. § 1013(b). This provision applies to boycotts and coercive practices against policyholders as well as among insurance companies and agents. *See St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978); *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d at 931. Pursuant to the Bar's regulations, all active members in the private practice of law, with the exception of patent attorneys, are required (1) to carry professional liability insurance and (2) to purchase such insurance from the Bar. *See* Board of Governors' Resolution, ¶¶ 1–2. In other words, in order to practice law in the State of Oregon, private attorneys, including Hass, are not only compelled to carry insurance, but are forced to take their insurance business to one particular insurer—the Bar. The plain meaning of the term "coercion" is clearly implicated where, as here, an individual's ability to pursue her livelihood is conditioned upon her willingness to deal with one particular insurer, to the exclusion of all other potential insurers. Indeed, it is difficult to envision a more coercive practice than the one at issue in this case.

This court's analysis in *Feinstein v. Nettleship Co. of Los Angeles*, 714 F.2d 928 (9th Cir.1983), lends considerable support to a finding that the Bar's regulations amount to coercion under § 3(b). In *Feinstein*, a county medical association had entered into a contract with an insurance company to provide medical malpractice insurance to all of its members who desired to purchase such insurance. Plaintiff doctors claimed that the agreement between the association and the insurance company amounted to "boycott and coercion" under the Act since a doctor had to become a member of the county medical association in order to purchase insurance from the association's designated insurance company. *Feinstein*, 714 F.2d at 933. The court rejected the doctors' claim, relying almost entirely on the fact that the association was not forcing them to buy association-sponsored insurance, nor was it preventing them from dealing with other insurers. Indeed, as the court pointed out, several doctors in the association were insured by other companies. The court concluded that because the agreement "in no way limited the doctors' ability to deal with third parties, the agreement itself is not an agreement to boycott or coerce the plaintiffs to purchase defendant's insurance." *Id.*

Unlike the agreement in *Feinstein*, the Bar's insurance scheme *does* limit the insured's ability to deal with third-parties. By finding this lack of compulsion within the medical association's agreement dispositive, the *Feinstein* court implicitly recognized that an agreement or practice which does impose such a limitation on policyholders likely constitutes coercion within the meaning of the Act. It thus seems apparent that the requirement that attorneys purchase malpractice insurance from the Fund amounts to coercion under § 3(b) and thus places the operation of the Fund beyond the reach of the McCarran–Ferguson exemption.

In light of the fact that the Bar can invoke neither the state action immunity doctrine nor the McCarran–Ferguson exemption for the business of insurance, I would reverse the district court's dismissal of Hass' action.